**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Maria Corral GARCIA, Defendant-
Appellant.**

**No. 73–1929.**

United States Court of Appeals,
Fifth Circuit.

June 24, 1974.

Rehearing Denied Aug. 13, 1974.

Rehearing and Rehearing En Banc
Denied Oct. 3, 1974.

---

9. See n. 2.

Joseph A. Calamia, John L. Fashing, El Paso, Tex., for defendant-appellant.

William S. Sessions, U. S. Atty., San Antonio, Tex., Edward Marquez, Ralph E. Harris, Asst. U. S. Attys., El Paso, Tex., for plaintiff-appellee.

Before BROWN, Chief Judge, and GEWIN and GOLDBERG, Circuit Judges.

GEWIN, Circuit Judge:

I

Mrs. Garcia appeals from a judgment of conviction under 21 U.S.C. § 841(a) [1] for possessing with intent to distribute approximately two pounds of heroin. After a bench trial, Mrs. Garcia was found guilty and sentenced to ten years imprisonment with a special parole term of five years. She raises two principal issues on this appeal: (1) whether the court erred in allowing statements allegedly elicited in violation of Miranda [2] to be used to support a search; (2) whether a motion to suppress evidence was erroneously denied.

Her second issue is based upon the premise that the heroin was discovered through an unconstitutional search. She contends that the search was unreasonable because there was no probable cause and that it cannot be justified as a "border search" or as a "voluntary consent" search. Furthermore, she contends that the government, in order to sustain a "consent" theory, was under an obligation to demonstrate that any alleged consent had been given with the knowledge that it could be freely withheld. We conclude that this case must be reversed and remanded for a new trial not for the precise reasons asserted on appeal but rather because a review of the record establishes that statements taken from Mrs. Garcia in violation of Miranda were used to enhance the prosecutions' case-in-chief.

II

Mrs. Garcia and her son attempted to cross the border between Mexico and El Paso, Texas. Upon approaching the primary inspection station, the license number of their automobile was routinely placed in a computer system known as CADPIN. The CADPIN report indicated that Mrs. Garcia was suspected of smuggling heroin.

In response to the positive CADPIN report she was referred to a secondary inspection. She possessed a valid permanent resident alien crossing card, and a search of her automobile failed to disclose any contraband. Similarly, personal searches of her and her son failed to produce any contraband. The Customs Inspectors, however, did discover in Mrs. Garcia's purse a key similar to the type used for storage lockers at bus depots. Apparently, the Customs Inspectors knew that such lockers were commonly employed by drug dealers to transfer narcotics.

---

1. 21 U.S.C. § 841(a) provides:
   (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
   (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

(2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

2. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.E.2d 694 (1966).

Special Agent Hirsch was notified by telephone of the positive CADPIN report and the discovery of the locker key. He arrived at the Paso Del Norte Port of Entry about one hour after the initial detention. Mr. Hirsch and Special Agent Henry talked to Mrs. Garcia outside the presence and hearing of her son in a small office with the door closed. They asked her the purpose of her El Paso visit, and she responded that her son had requested to come to El Paso for a hamburger. Agent Hirsch then left her in the small room and walked outside to ask her son the purpose of their trip. The son replied that he had not asked to come to El Paso for a hamburger but rather accompanied his mother at her request.

In response to further questioning by Agent Hirsch, Mrs. Garcia said that the bus locker key had been given to her by her daughter, and explained that the locker contained some Christmas gifts which she was to pick up and return to her daughter in Mexico. Mrs. Garcia told Agent Hirsch that she did not know where the locker was located. Agent Hirsch thought the key looked similar to those used at the Continental Bus Station and a telephone call to Continental further substantiated his suspicion. Mrs. Garcia was then asked whether she would have any objections to showing Agent Hirsch the contents of the locker and she stated he would be welcome to inspect because the locker only contained gifts.

Mrs. Garcia accompanied the officers to the bus station and opened the locker. Examination of the contents revealed a quantity of a substance that later was shown to be heroin. Mrs. Garcia was then placed under arrest for smuggling heroin and *for the first time* was advised of her *Miranda* protections. At a later time Mrs. Garcia explained her part in the heroin operation to the officers.

## III

If Agent Hirsch's questioning was a custodial interrogation, then the appellant was entitled to *Miranda* warnings. The Government contends that Hirsch's questioning was not a custodial interrogation. Rather, the Government would describe his actions as the "traditional investigative function and the general questioning of a citizen in the fact-finding process." The Government's characterization ignores the fact that Mrs. Garcia was detained for over an hour and questioned by two officers in a small room separated from her 13 year old son. Agent Hirsch himself testified that he had made up his mind to detain the appellant until he was satisfied as to the contents of the locker.

The Government characterization more importantly ignores our decision in United States v. Salinas, 439 F.2d 376 (5th Cir. 1971). Judge Bell, in *Salinas*, clearly delineated when a border detention becomes custodial.

> Thousands of persons enter the country daily and are subject to some degree of detention while their luggage is searched and they are asked routine questions concerning citizenship, destination, whether they have items to declare, questions regarding contraband, and the like. To hold that questioning of these types or routine border searches of luggage place a person "in custody" within the meaning of *Miranda* would unduly distort that case. . . . However, when the border search becomes more than routine, such as when a person is discovered to be concealing suspicious materials, or when a person is taken to a private room and strip searched as here, a different outcome obtains.[3] (citations omitted)

■ It is obvious that the governmental activity revealed here was more than "routine." Mrs. Garcia was subjected to a complete strip search and de-

---

3. 439 F.2d 376, 379, 380 (5th Cir. 1971). Judge Bell further explained that interrogation in the circumstances of a strip search room might compel appellants to speak where they would not otherwise do so.

tained for at least an hour. The discovery of the locker key had aroused the agents' suspicion. Under the *Salinas* standard, she was subjected to a custodial interrogation by Agent Hirsch. Her statements during this interrogation were used to aid the prosecution's case-in-chief. Agent Hirsch was permitted to testify about the inconsistent responses of Mrs. Garcia and her son regarding the purpose of their El Paso trip. He also testified concerning Mrs. Garcia's explanation of Christmas presents in the locker and her disclaimer of knowledge of the locker's location. Accordingly, she is entitled to a new trial without the introduction of these statements.

## IV

▮ Next we shall consider whether the heroin seized from the locker may be properly admitted into evidence. Mrs. Garcia asserts that the heroin was procured during an unreasonable search without probable cause. The Government does not contest the assertion of a lack of probable cause.[4] It seeks, however, to validate the search as a voluntary consent search or as a border search. It is well established that a search conducted pursuant to consent is excepted from the requirements of both probable cause and a warrant.[5] A prosecutor who seeks to introduce the fruits of such a search has the burden of prov-

ing the consent was voluntarily given and not the result of duress or coercion. This is a question of fact to be determined from all the circumstances. [6]

▮ Mrs. Garcia contends that the Government was under an obligation to demonstrate not only that the alleged consent had been uncoerced, but that it had been procured with an understanding by her that it could be freely and effectively withheld. She recognizes that the Supreme Court recently rejected this contention in a *noncustodial* situation.[7] Custody, however, is alleged to so heighten the possibilities for coercion as to require a specific warning of one's fourth amendment rights. This court has previously refused to distinguish custodial from noncustodial consent.[8] The test in either situation remains the same. Voluntariness is a question of fact to be determined from all the surrounding circumstances, and custody like the subject's knowledge of a right to refuse, is only one factor that should be taken into account.[9] Therefore, knowledge of fourth amendment rights is not necessarily required to validate consent to search after a suspect is in custody. Mrs. Garcia's next contention is that the *Miranda* violation should vitiate her alleged consent. If the evidence taken in violation of *Miranda* cannot be used to aid the Government on the issue of guilt, she argues that the statements

4. Since it is not claimed that probable cause was present we are not called upon to analyze the few specifically established and well delineated situations which would excuse the lack of a warrant. *E. g.*, Chambers v. Maroney, 399 U.S. 42, 51, 90 S.Ct. 1975, 26 L. Ed.2d 419 (1970).

5. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854, 858 (1973).

6. *Id.* 412 U.S. at 223, 227, 93 S.Ct. at 2045, 2048, 36 L.Ed.2d at 860, 863.

7. *Id.* 412 U.S. at 240, 93 S.Ct. at 2055, 36 L.Ed.2d at 870 n. 29. In *Schneckloth* "consent" was argued to be a "waiver" of rights under the Fourth Amendment. Accordingly, to establish "waiver", the prosecution must demonstrate an intentional relinquishment of a known right or privilege. *Id.* 412 U.S. at

235, 93 S.Ct. at 2051, 36 L.Ed.2d at 867. Finding the waiver theory inapplicable to the fourth amendment prohibition against unreasonable searches and seizures the Court limited the requirement of a knowing and intelligent waiver to those constitutional guarantees involving the preservation of a fair trial. *See also*, notes 17 and 18 *infra* and accompanying text.

8. United States v. Luton, 486 F.2d 1021, 1023 (5th Cir. 1973) ; United States v. Horton, 488 F.2d 374, p. 380, n. 4 (5th Cir. 1973) [No. 72–3574]. The Circuits are split on this issue, however. *See* United States v. Watson (9th Cir., No. 73–1539, Mar. 20, 1974) [14 Cr. L. 2299].

9. *Cf.* Schneckloth v. Bustamonte, 412 U.S. 218, 248, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854, 875 (1973).

elicited should similarly not be used by the Government during a motion to suppress to show her consent. Mrs. Garcia's application of the *Miranda* principles to statements proving consent to search has been almost universally ignored.[10] We are aware, nevertheless, that the independent application of *Miranda* principles to fourth and fifth amendment protections has been somewhat clouded by this court.

In both United States v. Legato[11] and United States v. Canseco[12] this court was faced with a consent search when *Miranda* warnings had been given prior to the consent. The consent searches were validated in each case, and the judgments of conviction were affirmed. Both opinions, however, mentioned the prior *Miranda* warnings. *Legato* stated, "[S]uch consent constitutes a valid waiver of fourth amendment rights if prior to the search *Miranda* warnings are given." Likewise, the *Canseco* court said, "Where *Miranda* warnings are adequate, further specific warnings relating to Fourth Amendment search rights are unnecessary to validate the search. . . ." In a subsequent case with prior *Miranda* warnings this court reviewed the language of *Legato* and *Canseco* and through the use of italics made the prior *Miranda* warnings seem even more crucial to the decision.[13]

None of the above cases directly presented a consent search situation without prior *Miranda* warnings. The court has faced the situation, however, on at least one occasion. In United States v. Horton[14] a custodial consent search was validated when *Miranda* warnings were not given until after the completion of the search. In *Horton* the court emphasized that the question of voluntary consent is a factual issue to be resolved from the totality of the circumstances. The resolution of that issue is not to be disturbed unless clearly erroneous.

Rather than rely on the intimations of those decisions not directly presented with this issue, we choose instead to cast our lot with what we perceive to be the weight of authority.[15] Accordingly, we hold that prior *Miranda* warnings are not required to validate consent searches in the circumstances here presented. Briefly stated, *Miranda* held that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the *privilege against self-incrimination*.[16] The fifth amendment privilege against self-incrimination plays a crucial role in preserving the integrity of the trial process, and this clearly was the principal basis for the Court's *Miranda* decision.[17] While the fourth amendment proscription against unreasonable searches and seizures is no less important than fifth amendment protections, it has not been recognized as promoting the integrity of the trial process.[18]

10. *See* United States v. Kunkel, 417 F.2d 299 (9th Cir. 1969) ; State v. Oldham, 92 Idaho 124, 438 P.2d 275 (1968) ; People v. Trent, 85 Ill.App.2d 157, 228 N.E.2d 535 (1967) ; State v. McCarty, 199 Kan. 116, 427 P.2d 616 (1967) ; Lamot v. State, 2 Md.App. 378, 234 A.2d 615 (1967) ; State v. Forney, 181 Neb. 757, 150 N.W.2d 915 (1967) ; adhered to State v. Forney, 182 Neb. 802, 157 N.W.2d 403 (1968) ; State v. Carlton, 83 N.M. 644, 495 P.2d 1091 (N.M.App.1972).

11. 480 F.2d 408 (5th Cir. 1973).

12. 465 F.2d 383 (5th Cir. 1972).

13. United States v. Luton, 486 F.2d 1021, 1023 (5th Cir. 1973).

14. 488 F.2d 374 (5th Cir. 1973) [No. 72–3574].

15. *See* note 10 *supra*.

16. Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

17. The Supreme Court has recently recognized the protection of a fair trial as the basis for *Miranda*. *See* Schneckloth v. Bustamonte, 412 U.S. 218, 239, 93 S.Ct. 2041, 2054, 36 L.Ed.2d 854, 870 (1973).

18. This distinction is expressly recognized in *Schneckloth*. The Court notes, "[t]here is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment.

In a fifth amendment context a defendant's statements, in and of themselves, present the potential constitutional evil. For purposes of the fourth amendment, however, it is an unreasonable search that must be condemned, not the use of a defendant's statements proving consent to a search. A search and seizure produces real and physical evidence, not self-incriminating evidence. Our task under the fourth amendment is to test the reasonableness of a search and exclude evidence procured unreasonably. We have been appropriately warned of the dangers inherent in "the domino method of constitutional adjudication . . . wherein every explanatory statement in a previous opinion is made the basis for extension to a wholly different situation."[19] Therefore, *Miranda's* ratio decidendi which was enunciated to strengthen the fifth amendment's function in preserving the integrity of our criminal trials should not be superimposed *ipso facto* to the wholly different considerations in fourth amendment analysis. Although in a proper case the need for such an extension may be shown, it does not appear before us now.

Finally we should review the traditional standards of voluntariness as recently set forth in Schneckloth v. Bustamonte.[20] The voluntariness of a consent to search depends on all of the particular facts and circumstances of each case.[21] The problem of reconciling the recognized legitimacy of consent searches with the requirement that they be free from any aspect of official coercion cannot be resolved by any infallible touchstone. Account must be taken of subtly coercive police questions as well as the possibly vulnerable subjective state of the person who consents.[22]

In view of our remand, the district court should consider all factors which may have some bearing on the question of consent including those which are favorable to the appellant and those which are favorable to the Government. Under all the facts and circumstances the consent must be voluntary or the search will be impermissible under the consent theory.[23]

Reversed and remanded.

---

. . . [Those] protections . . . are of a wholly different order, and have nothing whatever to do with promoting the fair ascertainment of truth at a criminal trial." *Id.* 412 U.S. at 241, 93 S.Ct. at 2055, 36 L.Ed.2d at 871.

19. *Id.* 412 U.S. at 246, 93 S.Ct. at 2057, 36 L.Ed.2d at 874 citing Friendly, The Bill of Rights as a Code of Criminal Procedure, 53 Calif.L.Rev. 929, 950.

20. 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

21. *Id.* at 248, 93 S.Ct. at 2059, 36 L.Ed.2d at 875. *See generally* 9 A.L.R.3d 858, 865.

22. Schneckloth v. Bustamonte, 412 U.S. 218, 229, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854, 864 (1973).

23. Because we find the search may be justified as a consent search we do not treat in depth the Government's contention that the search is permissible under border search principles as well. For a recent border search case that may be analogous, however, *see* United States v. Steinkoenig, 487 F.2d 225 (5th Cir. 1973).