353 So.2d 1299 (1977)
STATE of Louisiana
v.
Frank WILLIAMS.
No. 59813.
Supreme Court of Louisiana.
December 19, 1977.
Rehearing Denied January 27, 1978.
*1301 Eugene P. Cicardo, Alexandria, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Edwin O. Ware, Dist. Atty., Charles J. Yeager, Asst. Dist. Atty., for plaintiff-appellee.
SUMMERS, Justice.
Defendant, Frank Williams, was indicted by the Rapides Parish Grand Jury on October 6, 1976 for the offense of second degree murder. In a trial by jury he was found guilty as charged and sentenced to imprisonment at hard labor for life without benefit of probation, parole or suspension of sentence for a period of forty years.
At approximately 6:50 a. m. on August 21, 1976, a body was discovered on Bringhurst Street in Alexandria. The police were called, and upon arrival at the scene they found the bloody, battered body, nude from the waist up, lying on the side of the street in high grass. A crowd of neighbors had gathered, and one woman identified the body as "Sheri Williams", whom she had seen the previous night with Mary Louise Chew.
Acting upon this information, Sergeant Darren Coutee of the Alexandria Police Department proceeded to the residence of Mary Louise Chew who was known to him. Mary Louise Chew related to the officer that the victim's name was Shirley LaFontain and that she had been living with defendant Frank Williams, whose nickname was "Beaver", from whom she had separated several weeks previously. Williams, she said, lived in the Oil Mill Quarters.
Mary Louise Chew then related that while she was with LaFontain the night before at the Big Wheel Lounge defendant Williams arrived. During a conversation which followed with LaFontain Williams struck her with his fists, pulled a knife on her, banged her head against the wall and knocked her to the floor. He then picked her up and shoved her out of the place and into his car, a white automobile Chew believed to be a Chevrolet. This information brought to Officer Coutee's mind the fact that he had had contact with Williams before in the Lee Street area where he was formerly assigned as a foot patrolman.
Following this interview with Chew Officer Coutee returned to police headquarters where it was decided that he should contact the owner of the Big Wheel Lounge. At the lounge the owner, Milton Payne, Jr., verified the fact that Williams came into the lounge on August 20 and had an argument with LaFontain. A disturbance followed in which Williams slapped LaFountain several times and she fell to the floor. He saw Williams pick her up and they left the place together.
In the meantime the police had ordered an autopsy of the victim to determine the cause of death. After interrogating Payne, Coutee learned that the autopsy revealed that the victim died from a severe beating, blows to the head and brain hemorrhage. With this information and the statements of Chew and Payne, Officer Coutee proceeded *1302 to search for Williams. He began with a review of police records, where he found a reference to Frank Williams who lived at 431 North Seventeenth Street in Alexandria, an address in the Oil Mill Quarters referred to by Mary Louise Chew. According to the records, Williams had been arrested several times in the past, once involving a disturbance with Shirley LaFountain. The arrest report gave his alias as "Beaver".
Thus informed, and after conferring with the Assistant District Attorney, and having been advised by him that their information supported probable cause for an arrest, the police proceeded to 431 North Seventeenth Street to arrest Williams. Upon arrival at the North Seventeenth Street address the police knocked at the front door. Finding that door padlocked, they called out, "This is the Police. Is anybody home?" No one responded, so they went to the back door. Finding the back door slightly open and not locked, the police again knocked and announced their presence. When no one answered, they entered with drawn weapons in search of a person they considered to be a dangerous felon who had committed a homicide. At that time they were instructed by the police captain not to touch anything.
As they entered they saw bloody towels in a bathroom area, and a pair of socks on the floor near a bath tub. In the bedroom they observed what appeared to be blood on the door facing and spots of blood on the floor and on a small table. Coutee also recognized a photograph of Frank Williams on the small table. The photograph depicted Williams standing near a white Oldsmobile. An envelope and a knife were found on the same table. Officer Coutee opened and examined the contents of the envelope and found the automobile registration papers for a 1967 Oldsmobile belonging to Williams.
Finding no one in the house, the officers proceeded to headquarters to obtain a search warrant, leaving Officer Guillot outside to secure the premises. Officers Coutee and Mayeaux decided en route to pass through the Lee Street area hoping to locate the white Oldsmobile. In doing so they located the vehicle near the 1000 block of Lee Street.
An inspection disclosed the window on the front passenger side to be open, through which the officers saw a pair of men's trousers and what appeared to be traces of blood which had been wiped off of the front and rear seats. The car was then towed to headquarters.
In the meantime Frank Williams had been located in the Lee Street area and arrested. He was booked at the city jail, advised of his rights and questioned. In the beginning of this interrogation Williams signed a consent to search the premises at 431 North Seventeenth Street and the 1967 Oldsmobile, authorizing the taking from the premises or vehicle any letters, papers, materials, or other property which the police should desire. As a result of the questioning which followed, and after Williams was again advised of his rights, a lengthy statement was reduced to writing by Sergeant Coutee and signed by Williams at 1:00 p. m. Therein Williams admitted virtually all of the facts recited above, except that he denied killing LaFontain, saying she left his house the night before at ten o'clock.
Relying on the written consent to search signed by Williams, Detectives Christie and Hay proceeded to 431 North Seventeenth Street. Upon arrival they entered the house through the unlocked back door. Detective Christie photographed each room and particular places or things pertinent to the investigation. They also collected objects as evidence, such as a man's bloodstained shirt, a bloodstained photograph depicting Williams standing next to his white Oldsmobile, a knife, a bloodstained iron bar, two towels from the bath tub and samples of blood droplets from the front porch floor and from several areas of the living room. They then returned to headquarters where the evidence obtained was tagged and placed in the evidence locker.
Detective Christie was then directed to search the white Oldsmobile. He found the back seat to be saturated with coagulated blood, blood on the front seat and Williams' bloody trousers. After a thorough search, *1303 the items having evidentiary value were taken to police headquarters and placed in the evidence locker. All items were delivered to the State Crime Laboratory the next day.
On February 7, 1977, prior to trial, a motion to suppress was filed on behalf of defendant. The motion alleged that certain photographs and physical evidence in the possession of the State Crime Laboratory should be suppressed as evidence because they were obtained by an unconstitutional search and seizure without a search warrant at the residence of the defendant and his 1967 white Oldsmobile.
At the same time a separate motion was filed to suppress all written statements, confessions or other written inculpatory statements obtained by law enforcement officers from the defendant Williams. The ground alleged for the suppression was that the statements were not free and voluntary and defendant did not knowingly or intelligently waive his right to remain silent, his right to counsel or his right against self-incrimination.
The hearing on those motions to suppress established the facts narrated above. On the basis of this evidence the trial judge found that the original entry into defendant's home was proper, because the officers had probable cause to arrest defendant and no warrant was necessary in an effort to carry out an arrest. He further held that the evidence was overwhelming that the consent to search was providently given after full rights were explained to defendant and he voluntarily consented to the search of his house and car. Both motions to suppress were denied.
Concisely stated, defendant's position at the trial was that on August 20, 1976, the day of the alleged altercation at the Big Wheel Lounge, LaFontain had been at his house. She was suffering a nose bleed at the time and took a bath to wash away the blood. However, after she visited there during the early evening, she left and he did not see her again. He denied that he killed her.

I.
The motion to suppress should have been granted, the defense contends, because entry into a man's house without a warrant in order to arrest him on probable cause is per se constitutionally unreasonable in the absence of one of a number of well-defined exceptions to the warrant requirement. In this instance, it is argued, there were no exigent circumstances to satisfy the probable cause exception to the warrant requirement. While this proposition may be supported by court decisions, the circumstances of this case present another problem. For the purpose of this discussion it is assumed that the officers had probable cause to arrest Williams when they arrived at his house, and that there was no showing that exigent circumstances existed supporting any entry into his house without a warrant. Nevertheless, the written consent to search and seize objects and information from defendant's house and automobile, which was later signed by him, in this Court's view, rendered the previous entry lawful and reasonable under the consent or waiver exception to the warrant requirement.
At the outset it is noted that the trial judge found the evidence was overwhelming that the consent to search was providently given after full rights were explained to defendant and he voluntarily consented to the search of his house and car. The record amply supports this factual finding. There is, in fact, no defense evidence to the contrary. At the trial defendant took the stand in his own behalf and readily admitted signing the consent to search, declaring he "had nothing to hide."
It is noted, also, that at the time of signing the written consent Williams was aware of the fact that the police had previously entered his house to arrest him, and the written statement signed by him conceded that he lost his temper at the Big Wheel Lounge, "hit her a coupla times", and "pulled . . . [his] pocket knife on her and scratched her in the chest with the knife." He admitted pulling her out from the table and that she fell to the floor and her head was bleeding. When they entered *1304 his car she rode both in the back seat for a time, and in the front seat; blood from her head was on the front and back seat. At his house, he said, he slapped her again. At that time her nose started bleeding and blood was on the floor, on her clothes and in the bathroom. Williams claimed that the victim bathed and left, and that he did not kill her.
These admissions and concessions demonstrate that defendant harbored no reasonable expectation of privacy relative to these facts which were also revealed to the officers conducting the initial search.
The consent given under these conditions is not only a consent to future searches and seizures, but it amounts to a waiver of the warrant requirement with respect to the search previously conducted. Essentially all facts uncovered by the initial search, except the actual killing had been admitted.
The Fourth Amendment to the United States Constitution and Section 5 of Article I of the Louisiana Constitution guarantee that people shall be secure in their houses and effects against unreasonable searches and seizures, and that no warrant shall issue without probable cause supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized.
Evidence obtained by a search and seizure in violation of the Fourth Amendment is now inadmissible in state as well as federal courts by virtue of the principles announced in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Mapp held that the Fourth Amendment to the United States Constitution is applicable to the states through the due process clause of the Fourteenth Amendment. The decision declared further that, as a matter of federal due process, evidence obtained as a result of an invalid search or seizure is inadmissible. This decision interpreting the United States Constitution requires all states to follow the exclusionary rule. James v. Louisiana, 382 U.S. 36, 86 S.Ct. 151, 15 L.Ed.2d 30 (1965).
One may waive any constitutional right or privilege, provided it inheres in the individual and is intended for his benefit, and provided further the waiver is voluntary. More specifically the constitutional right to be secure against unreasonable searches and seizures may be waived, Zap v. United States, 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946); thus, a search to which an individual consents meets Fourth Amendment requirements, Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and is another in "these carefully defined classes of cases" which constitute an exception to the warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); State v. Anthony, 347 So.2d 483 (La.1977); 345 So.2d 452 (La.1977); State v. Cook, 345 So.2d 29 (La.1977); State v. Temple, 343 So.2d 1024 (La.1977); State v. Johnson, 343 So.2d 155 (La.1977).
In resolving the issue of voluntariness of consent to search and seizure, the circumstances of each case are to be considered. Custody is only one factor and does not of itself render the consent involuntary. United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Nor is a voluntary consent to a search rendered invalid solely on the basis that a suspect has not been given the Miranda warnings, United States v. Kunkel, 417 F.2d 299 (9th Cir. 1969), or warnings as to his Fourth Amendment rights. Govt. of Virgin Islands v. Berne, 412 F.2d 1055 (3d Cir. 1969), cert. denied, 396 U.S. 837, 90 S.Ct. 96, 24 L.Ed.2d 87, reh. denied, 396 U.S. 937, 90 S.Ct. 261, 24 L.Ed.2d 239. Notwithstanding that Miranda warnings were not required, this record reflects that Williams was given those warnings prior to signing the consent to search.
On several occasions recently, this Court has upheld consent searches where the suspect granting the consent was in custody and the consent was to search a vehicle which had already been impounded by law enforcement officers. State v. Linkletter, 345 So.2d 452 (La.1977); State v. Rogers, 324 So.2d 403 (La.1975); State v. McMellon, 295 So.2d 782 (La.1974). There was, in those cases, no exploitation of the challenged impoundment, but the searches and *1305 seizures were made as a result of subsequent valid consents, a basis sufficiently distinguishable to be purged of the primary taint. The situation is the same here. The first search was not unreasonable, oppressive or such as would shock the conscience of justice, nor was it contrary to one's sense of fair play. The searching officers did not offend defendant's dignity. Any taint resulting from the initial intrusion is sufficiently purged by the subsequent consent.
Therefore, even if the initial entry into defendant's house and impoundment of his automobile resulted in a warrantless search or seizure, the subsequent voluntary, written consent to search a second time amounted to a waiver of the warrant requirement rendering both the first and second search and seizures valid. Consequently, the ruling of the trial judge denying the motion to suppress was correct.

II.
A contention is made on behalf of the defense that a number of photographs introduced in evidence were inflammatory and lacking in sufficient probative value to counterbalance their prejudicial effect upon the jury. Moreover, according to the defense, a number of these photographs were irrelevant and unrelated to the element of the crime the prosecution was required to prove.
Thirty photographic color slides were exhibited to the jury by projection onto a five-by-six-foot screen. They were taken by Officer Christie and depicted the body of the victim at the place where it was first discovered, the defendant's car and its bloody condition, the interior and exterior of defendant's house where the alleged homicide occurred, etc. In an abundance of caution the prosecution asked for an out-of-court session to have the trial judge view these pictures and rule upon their admissibility before they were presented to the jury. This was done, and the trial judge found the pictures admissible. The defense objected and assigned error.
The photographic slides were projected on the same sized screen used in the trial court in order that the Justices of this Court might view them under the same circumstances. The Court has concluded that the pictures as projected were not unduly inflammatory, gruesome or prejudicial. They were relevant and material to the issues before the jury, and the ruling of the trial judge was correct.
Nor does the fact that the defense stipulated to the death of the victim relieve the State of the burden of establishing the cause of death. In this case the body of the victim was shown by the photographs to have been subjected to multiple wounds and bruises. The State's case was based upon the theory that defendant brutally battered the victim to death. The photographs were relevant to prove not only the death of the victim, but that she died as a result of a beating.
While the photographs were unpleasant they were not so gruesome as to overwhelm reason and cause a jury to lose sight of the need for the prosecutor to establish with sufficient independent evidence the guilt of the accused. State v. Smith, 327 So.2d 355 (La.1976).

III.
While the defense brief complains that the prospective juror Donna W. Edwards should have been challenged for cause, the record discloses that she was accepted by the defense. This assignment is without merit.

IV.
It was an objectionable inference without basis, the defense argues, for the police to testify that drag marks on the porch leading from the front door of defendant's house to the edge of the porch appeared to be heel marks, as though someone had been dragged from the front door to the edge of the porch.
Reasonable inferences from facts may be drawn by witnesses sufficiently knowledgeable and experienced with the subject matter; permitting such an inference to be drawn will ordinarily fall within the sound discretion of the trial judge. The *1306 common sense inference drawn by this officer who had participated in this investigation was permissible.

V.
At the trial defense counsel requested permission to read to the jury from a copy of defendant's statement which had been reduced to writing by Officer Coutee. This was objected to by the prosecutor on the ground that the original of the statement was in evidence and available to defense counsel and it should be used instead of the copy. The original was, moreover, according to the prosecutor, the best evidence of Williams' statement, and, furthermore, Williams was able to testify to what he said at the time the statement was reduced to writing. The objection was sustained on the last ground. Defense counsel was not permitted to argue the objection.
A better ruling, in this Court's view, would have been to permit defense counsel to read the original statement to the jury if a proper basis for doing so had been presented. However, no prejudicial effect is shown by the ruling. There is no validity to the defense argument that this illiterate defendant could not know and should not have been required to testify to facts contained in the statement without having it read to the jury. A copy of the statement was shown to be in possession of defense counsel. He could have fully informed the defendant of its content by reading it to him before he took the witness stand.

VI.
The prosecutor's rebuttal in closing argument is claimed by the defense to be beyond the subject matter of the closing argument of defense counsel. As the defense argument is understood, the State should not have been permitted to reargue its entire case on rebuttal, and mention by the prosecutor on rebuttal that the victim had been beaten by defendant with his fists was improper. Beating of the victim by defendant with his fists had never been alluded to until it was mentioned by the prosecutor on rebuttal, the defense argues.
According to Article 774 of the Code of Criminal Procedure, argument of counsel must be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the State or defendant may draw therefrom, and to the law applicable to the case, and the State's rebuttal shall be confined to answering the argument of the defendant.
If the rebuttal goes beyond the scope of the defense argument, the only protection available to the defense is admonition by the court or contempt proceedings.
A review of this record indicates that defense counsel's closing argument touched upon almost all aspects of the case. The State's rebuttal, then, was entitled to similar scope. Reference to defendant beating the victim with fists was an acceptable conclusion to be drawn from the evidence.
There is no merit to this assignment.

VII.
After the jury returned a verdict of guilty, the defense moved for a new trial. Although the written motion has apparently not been made part of this appellate record, it is understood from the transcript of the hearing held on the motion that it is based upon an allegation that Officer Christie lied at the trial. In his rebuttal testimony at the trial Officer Christie testified that he observed many small BB-sized holes in the kitchen wall of defendant's house. These holes, he said, were similar in size to certain holes in the victim's arm. This was proper rebuttal since defendant had previously denied that the wall had any such holes.
The trial judge denied the motion and refused to go to the scene to inspect the wall which defendant said contained no such holes. In his per curiam the trial judge explained that Officer Christie's testimony at the trial was to the effect that there were holes in the wall similar to those in the victim's body. The trial judge laid considerable stress upon the fact that the *1307 defendant, who had testified in his own behalf, did not take the stand to rebut Officer Christie's testimony. He was in a position to do so having lived there two years. The trial judge held, therefore, that the motion alleged no newly discovered evidence which could not have been discovered by the exercise of reasonable diligence by the defendant. He was of the opinion also that the evidence if presented at the trial would not have changed the guilty verdict. There was no error in this ruling. La.Code Crim.Pro. art. 851.
For the reasons assigned the conviction and sentence are affirmed.
CALOGERO, J., concurs.
TATE, J., concurs and assigns reasons.
DENNIS, J., concurs for the reasons assigned by TATE, J.
TATE, Justice, concurring.
The writer concurs in the affirmance. However, he differs with the majority's rationale in denying the motion to suppress evidence as unconstitutionally seized.
The warrantless entry and search of the accused's home was an unconstitutional entry and search. State v. Ranker, 343 So.2d 189 (La.1977). If items introduced in evidence had then been seized, the motion to suppress them should have been sustained.
The initial entry through a partially opened door, when the police had probable cause to arrest a person for a homicide of a few hours earlier, may have been justified, at least for purposes of ascertaining if the killer were present. Even so, their full search of the premises without a warrant is not shown to be justified by any exigent circumstances.
Nevertheless, in view of the information received from other informants and from the accused himself, there was probable cause for the later search of the premises, at which the evidence sought to be suppressed was actually seized. The accused's consent to this search made constitutionally valid both it and the subsequent seizure of the evidence now objected to; just as if a search warrant had been secured upon a probable-cause affidavit setting forth the facts relied upon.
I would not agree that a subsequent consent necessarily validates a prior unconstitutional search and seizure. While no abuse is here shown, the deterrent purposes of the exclusionary rule could be undermined, if lawless searches and seizures were used to justify arrests and interrogation, which in turn produced a post-dated consent to a previous search, a consent obtained from an accused only after he is in police custody.
In conclusion, however, even conceding the unconstitutional entry and search in this case, the evidence was seized as a result of a subsequent lawful search. It was thus admitted into evidence on a basis independent of the initial unconstitutional search.
For approximately the same reasons, I would also not hold to be constitutionally deficient the post-consent search of the automobile, which resulted in the only seizure of its contents (till then only glimpsed in plain view through the windows).
Accordingly, I concur in the majority's affirmance of the district court ruling denying the motion to suppress, and in its affirmance of the conviction.