NORRIS, Judge.
The defendant, Henry “Lewis” Ealy, age 55, was indicted for second degree murder, LSA-R.S. 14:30.1, and with having committed this offense with a firearm, LSA-R.S. *1310 14:95.2. The defendant pled not guilty and proceeded to a jury trial. He was found guilty by a 10-2 vote. His post verdict motions for a new trial and modification of verdict were denied and he was sentenced to the mandatory term of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. He now appeals, advancing twelve assignments of error, of which nine have been neither argued nor briefed and are therefore abandoned. URCA-Rule 2-12.4; State v. Williams, 338 So.2d 672 (La.1976). The remaining three assignments of error allege:
(1) The verdict of second degree murder was contrary to the law and evidence.
(2) The trial court erred in not modifying the verdict to manslaughter pursuant to LSA-C.Cr.P. art. 821.
(5) The trial court erred in denying defendant’s motion to suppress physical evidence.
These assignments do not present reversible error. Accordingly, we affirm Ealy’s conviction and sentence.
FACTS
Prior to the shooting, Ealy and the victim, Barbara Coney, were living together as boyfriend and girlfriend in Ealy’s house on East Blvd. in Shreveport. Ealy worked at Lewis Youree Drive Drugstore; Barbara drew welfare and was not holding a regular job. Ealy’s friend, Clyde O’Neal, testified that Barbara was “working the streets” for a living, under the name of “Little Mama, Big Drawers.” Barbara Coney was 4'7" tall. On the evening of February 7,1986, between 9:00 and 10:00 p.m., Barbara’s brother, Regan Williams, and his girlfriend, JoAnn Nelson, were returning to Regan’s home on Jordan St. where he lived with his (and Barbara’s) mother, Gloria Williams. As they were pulling in, their attention was attracted to Ealy arriving right behind them in his truck, with lights on and horn blowing. Ealy alit from the truck and asked them to take Barbara to the hospital, or perhaps told Regan to tell Mrs. Williams to carry her to the hospital; he might have said, “We need to get Barbara to the hospital.” Regan and JoAnn then spotted Barbara slumped over in the truck, or lying on the front seat, with blood on her clothing. As they started inside to fetch Mrs. Williams, they heard Ealy re-enter the truck; when he shut the door, they heard the tinkling of broken glass on the pavement. As Mrs. Williams was coming out the front door, Ealy suddenly drove off, but not before she caught a glimpse of Barbara slumped down in the truck. Noting that Ealy had driven in the direction of Barbara’s grandmother’s house, Mrs. Williams and JoAnn got in the car and attempted to follow Ealy.
Barbara’s grandmother, Mrs. Johnson, testified that around this time she heard Ealy blowing his horn in front of her house. Before she could go outside, however, he had sped away. Moments later, JoAnn and Mrs. Williams arrived; not finding Ealy there, they started for the hospital.
Meanwhile Ealy drove to Freewater St. to see his longtime friend, Clyde O’Neal, and enlist his help. Again, Ealy stopped in front of the house and blew the horn. Clyde’s daughter, Cheryl, and his girlfriend, Charlotte Parish, who was about 19 years old, were home with him at the time. Clyde came out to the truck and saw blood on the seat and on Ealy’s jacket. He checked Barbara for a pulse and found none, though she was “still warm.” R.p. 249. Cheryl and Charlotte, who were standing at a distance, both testified they heard Ealy say, “I think I killed the bitch,” but Clyde did not recall this. Clyde testified he told Ealy to take Barbara to the hospital. Cheryl and Charlotte accompanied Ealy because Clyde said he was ill at the time. They testified that Ealy appeared to have been drinking and was having trouble driving. Charlotte initially thought Barbara had passed out from too much drink.
En route to the hospital, JoAnn and Mrs. Williams caught up with Ealy’s truck. Barbara appeared to be sitting up between Cheryl and Charlotte as Ealy drove. JoAnn pulled up alongside the truck and *1311 Mrs. Williams exchanged words with Ealy as they drove along.
When they reached the LSU Medical Center emergency room, Charlotte and Cheryl went inside to get help; Ealy remained outside. When they returned, Mrs. Williams, who had pulled up behind, confronted them. According to Charlotte and Cheryl, Mrs. Williams was asking, “Which of you bitches killed my daughter?” or “Who shot or stabbed my daughter?” According to Mrs. Williams, she suspected Ealy, but just wanted to verify her suspicions.
Medical personnel rushed outside to carry Barbara into the emergency room. Nurse Morris and Dr. Carstens, who helped remove her from the truck, noticed the driver’s window was broken. As soon as Barbara was taken inside, Ealy told Charlotte and Cheryl to get back in the truck; he immediately drove away.
Emergency room personnel determined that the victim had been shot, but that the bullet which entered had not exited the body. Revival efforts were unfortunately futile; Dr. Barrett estimated she had been dead at least 30 minutes on arrival.
On the drive back to the O’Neal house on Freewater, Cheryl asked Ealy, “What happened?” and “How did you do it?” Ealy responded by pulling a .38 caliber R.G. revolver from under the seat and saying, “With this M.F. right here.” Cheryl also testified that Ealy muttered something about Barbara turning a trick and not getting paid for it. According to Charlotte, Ealy told them, “I shot the bitch, and I hope she dies” and “This is what I shot the bitch with.” Charlotte added that Ealy was mad, upset, and had been drinking. Both Charlotte and Cheryl identified the gun and the clothing Ealy was wearing that night. Charlotte also noticed a whiskey bottle in the truck. Ealy dropped off Cheryl and Charlotte at the house on Free-water and drove away.
Meanwhile, police arrived at the hospital. Sgt. McGaha received a description of the vehicle and suspect that delivered the victim. He also found broken auto glass on the pavement and instructed an I.D. officer to collect it. Officers Hayes and Huddle-ston went to Ealy’s house on East Blvd! and saw the described truck parked in front; it was registered to Ealy. They knocked on the door and Ealy answered. He apparently had been drinking but was not drunk. He said he would go with them. Before leaving, he wanted to fetch a jacket, so Officer Hayes followed him in; Hayes noticed a bloodstained beige jacket and seized it.
Ealy told Officer Hayes that he had been over at a friend’s house on Freewater and that someone there had asked him to carry the victim to the hospital. He led officers to Clyde’s house, where statements were taken from Cheryl and Charlotte. These did not corroborate Ealy’s story. Cheryl and Charlotte were later taken to the police station, questioned and tested for gunshot residue on their hands. Ealy was taken to jail; after he had changed into prison garb, his clothes were found to be bloodstained. Later, Officer Price came to Ealy’s house and noticed the truck’s shattered window and bloodstained seat. Broken glass was collected from the pavement; the truck was towed and secured.
The next day, February 8, Ealy signed a consent to search form authorizing the search of his truck and house. The search was executed; officers found glass with blood on it inside the truck. In the house they found a blue steel .38 caliber revolver stuck between the mattresses in Ealy’s bed, a bottle of bourbon (apparently bloodstained) on the dresser, and a bloody washcloth in the clothes hamper. These various items were seized and identified at trial.
Ealy testified in his own defense. He said that he and Barbara had been living together for some time, and admitted that she was “out on the street for a living; do anything for a dime or 15 cents.” R.p. 622. Ealy admitted he and Barbara had once argued when he caught her leaving the house with “a dude”; a fight had ensued in which Barbara used a broken wine glass and Ealy pulled a knife. Barbara always carried a gun and slept with a gun or knife near the bed. Ealy had been telling her to “clean up her act” and “get right,” to give *1312 up prostitution and her daily cocaine habit. According to Ealy, he picked her up at Mrs. Williams’s house around 2:15 p.m. that day and ran some errands; they went to A.P. DeFatta’s and bought a bottle of bourbon, which Barbara was drinking out of a juice glass. They returned to Ealy’s house, where Barbara got on the phone and “lined up some money.” Ealy asked how much, and she said fifty-five dollars. After a while, a woman whom Ealy had seen only once before and he thought was called “Brenda” came over and drove off with Barbara. Ealy then left to see another friend, called “Brayboy,” to whom he owed money, and as he was leaving Brayboy’s house, he ran into Barbara, who asked him, “You don’t want your money?” Ealy replied, “My pocket is empty, needs to be filled.” She gave Ealy $20 and he said, “What’s this for?” She replied, “That’s all he gave me.” Ealy gave her the money back and said, “You take that $20. That will help you on your way ... your clothes is already packed.” R.p. 628.
According to Ealy, Barbara followed him to the truck; they both got in and an argument broke out. He claims she bit him, “snatched” him across the seat and got down on top of him. He attempted to get away by lodging his foot on the driver’s door and pushing, but said he accidentally propped against the window and kicked it out with his boot. They stopped struggling and Ealy pointed at the window and said, “Just look at that! Ever since I had you, you cost me money.” Ealy said he picked some of the broken glass out of the window, and then Charlotte Parish walked up. According to Ealy, Barbara accused him of having a relationship with Charlotte; he denied it but she pulled a pistol from under the seat and said she’d rather see him dead than with another woman. Another struggle ensued, and Ealy made the “big snatch” to wrest the pistol from her; as he was falling back the gun discharged. The impact knocked him out the open door. He got back in the truck and told her to leave, but she didn’t move. So he placed the pistol on the floor and drove over to Mrs. Williams’s house.
Ealy admits arriving there just as JoAnn arid Regan were driving up, but said he left because he anticipated a “confusement” there. He also admits proceeding to Clyde O’Neal’s house, and Charlotte and Cheryl joining him for the ride to the hospital. He said the blood got on his jacket when he and Clyde’s son tried to lift Barbara. Ealy admits running into Mrs. Williams at the emergency room and hearing her accuse the girls, Charlotte and Cheryl, of killing Barbara. He said he left because he expected a “feud.” He drove them to Clyde’s house on Freewater St. and then went home, taking one sip of the bourbon on the way. Before he could change clothes, the police were knocking. At trial he denied telling the police that someone had asked him to carry the victim to the hospital, or ever showing or talking about the pistol to the girls in the truck. He explained the bloody washcloth in his house as having been left by a nephew who injured himself repairing a car.
Several forensics experts testified for the state. Terry Franklin, a firearms criminologist, testified that the pistol seized from Ealy’s house could not have been fired accidentally unless the trigger was pulled completely back. The gun could be fired single action (with the hammer cocked) at four pounds pressure or double action (without cocking) at twelve pounds. Uncocking would not make the gun discharge. Mr. Franklin also found glass particles on the bullet removed from the victim’s body; this, together with the shape of the bullet, led him to conclude the bullet had passed through an intermediate glass surface before striking the victim. His theory also explained the large size and ragged shape of the wound, as well as the complete absence of gunpowder residue or unburned gunpowder particles on the victim’s sweater. Mr. Franklin also verified, from sample shooting, that the bullet extracted from the victim’s body had been fired from the gun in evidence. He finally testified that despite close examination under a dissecting microscope and an infrared camera, no gunpowder residue was found in the victim’s clothing.
*1313 Robert Hamilton, another criminologist in firearms identification, verified Mr. Franklin’s findings, adding that the absence of residue could be attributed either to a great distance between the discharging weapon and the victim, or the presence of an intermediate target to block the residue. He further stated that the bullet’s shape and the particles embedded on it led him to believe it had struck glass before entering the victim’s body. He discounted the theory that the bullet had ricocheted off a bone inside the victim’s body because the bullet’s head was flattened rather than impressed at an angle. Mr. Hamilton examined the gunshot residue tests taken from witnesses Cheryl O’Neal and Charlotte Parish, and both were negative. However, the tests taken from Ealy and the victim showed residue. Mr. Hamilton admitted that residue could have been transferred from Ealy’s hands had they touched the victim’s.
Richard Beighly, a forensic serologist, testified that the broken glass gathered from the pavement at Mrs. Williams’s house and at the hospital matched that remaining in Ealy’s truck. He also found blood on the glass from the hospital and concluded it was human blood. Human blood was also found on the washcloth seized from Ealy’s house, as well as on his clothes. Glass particles similar to the truck glass were also found on the clothing items.
Dr. George McCormick, the coroner, testified as a forensic pathologist. He performed an autopsy and determined the victim died from blood loss from a single gunshot wound that entered the chest and struck the aorta. The size and shape of the wound were consistent with the theory that the bullet passed through an intervening substance before striking the victim. He stated positively that the bullet struck no bones in the body and did not show the shearing that usually results from contact with bone; he thus denied the defense’s hypothesis that the bullet’s deformity was due to impact with a bone. Dr. McCormick determined that the victim had a blood alcohol level of .19% at the time of her death; she appeared to be suffering from gastritis, which is sometimes caused by excessive use of alcohol. She also had traces of cocaine in her system and recent needle marks on her arms. Dr. McCormick stated, however, that Barbara Coney did not die from either of these substances.
DISCUSSION: MOTION TO SUPPRESS
By his fifth assignment of error Ealy contends the trial court erred in failing to suppress evidence seized from his house and truck pursuant to a consent to search. He claims his consent was not free and voluntary because of a violation of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).
A search conducted with the subject’s consent is a recognized exception to both the warrant and probable cause requirements. State v. Wilson, 467 So.2d 503 (La.1985), cert, denied 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985); State v. Owen, 453 So.2d 1202 (La.1984). When the state seeks to rely on consent to justify a warrantless search, it must demonstrate that consent was given freely and voluntarily, without coercion. State v. Clark, 446 So.2d 293 (La.1984); State v. Yarbrough, 418 So.2d 503 (La.1982). The voluntariness of defendant’s consent is a question of fact to be determined by the trial judge under the facts and circumstances surrounding each case and the trial court’s determination as to the credibility of witnesses is to be accorded great weight on appeal.' State v. Wilson, supra; State v. Edwards, 434 So.2d 395 (La.1983).
The transcript from the suppression hearing shows that at 4:00 p.m. on February 8, the day after the arrest, Officer Hayes and Det. Baker went to speak to Ealy in jail. He did not appear drunk at the time. They gave him his Miranda rights and he seemed to understand. Ealy replied that he wanted an attorney and did not wish to speak without one present. The officers complied with this request but asked for permission to search his house and truck. Ealy complied.
Under Edwards v. Arizona, supra, when an accused has invoked his right to have *1314 counsel present during custodial interrogation, he may not be subject to further interrogation until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversation with the police. Here, Ealy’s consent to search was obtained after he had invoked him right to counsel, and it was not offered at Ealy’s instigation.
Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966), holds that as a constitutional prerequisite to the admissibility of a statement taken from a suspect under custodial interrogation, the suspect must be advised of the three essential rights and must make a clear and intelligent waiver of those rights. Edwards v. Arizona, supra, builds on Miranda. It extends Miranda logically by saying that once the rights are invoked, interrogation ought to cease, since a confession given under the circumstances would be inadmissible anyway. It also limits Miranda by providing that the suspect may waive the rights if he initiates the further questioning.
The instant case raises the novel question of whether a consent to search may be nullified because it was given after the suspect had invoked his right to silence under Miranda as interpreted by Edwards. Louisiana’s jurisprudence clearly holds that Miranda warnings do not have to be given before a consent to search is obtained. State v. Williams, 353 So.2d 1299 (La. 1977), cert, denied 437 U.S. 907, 98 S.Ct. 3098, 57 L.Ed.2d 1138 (1978). The United States Fifth Circuit has also held that Miranda warnings are not required to validate a consensual search. See United States v. Legato, 480 F.2d 408 (5th Cir. 1973) and United States v. Canseco, 465 F.2d 383 (5th Cir.1972); United States v. Garcia, 496 F.2d 670 (5th Cir.1974), cert, denied 420 U.S. 960, 95 S.Ct. 1347, 43 L.Ed. 2d 436 (1975). In Garcia, the court explained that Miranda warnings are intended to secure the fifth amendment privilege against self-incrimination, which plays a crucial role in preserving the integrity of the trial process. Fourth amendment protection against unreasonable searches and seizures is no less important, but is not recognized as promoting the integrity of the trial process. The court summarized:
In a fifth amendment context a defendant’s statements, in and of themselves, present the potential constitutional evil. For purposes of the fourth amendment, however, it is an unreasonable search that must be condemned, not the use of a defendant’s statements proving consent to a search. A search and seizure produces real and physical evidence, not self-incriminating evidence. * * * Therefore, Miranda’s ratio decidendi which was enunciated to strengthen the fifth amendment’s function in preserving the integrity of our criminal trials should not be superimposed ipso facto to the wholly different considerations in fourth amendment analysis. * * *
496 F.2d at 675. See also State v. Linklet-ter, 345 So.2d 452, 457 (La.1977). It strikes us as intuitive that if a suspect in custody may validly give a consent to search without the benefit of prior Miranda warnings, then he may validly give consent after receiving the warnings and exercising the rights outlined in Miranda. In fact, the United States Second Circuit has squarely held this to be so. United States v. Busic, 592 F.2d 13 (2d Cir.1978).
To determine the validity of a consent to search, the federal courts have held repeatedly that the totality of the circumstances, rather than just one factor (such as Miranda warnings) should be examined. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041,36 L.Ed.2d 854 (1973); United States v. Garcia, supra; United States v. D’Allerman, 712 F.2d 100 (5th Cir.1983), cert, denied 464 U.S. 899, 104 S.Ct. 254, 78 L.Ed.2d 240 (1983); United States v. Lemon, 550 F.2d 467 (9th Cir.1977) (holding that Miranda warnings do not provide a “prophylactic rule” for the exclusion of consensual searches); Cody v. Solem, 755 F.2d 1323 (8th Cir.1985), cert, denied 474 U.S. 833,106 S.Ct. 104,88 L.Ed.2d 84 (1985). This analysis is consistent with the Louisiana jurisprudence outlined in State v. Wilson and State v. Edwards, supra.
*1315 Furthermore, a leading fourth amendment scholar writes that only two states have found that consent to search must be preceded by proper Miranda warnings. See W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 8.2(j) (West, 1978, with 1986 p.p.).[1] Professor LaFave states, “The prevailing and better view * * * is to the contrary.” In People v. Thomas, 12 Cal.App.3d 1102,. 91 Cal. Rptr. 867 (1970), the California court of appeal explained persuasively:
As we see it the answer to the problem before us depends on whether by requesting and obtaining the defendant’s consent for the search of his apartment the police violated a value which Miranda was designed to protect. The question is not whether, had the Miranda warnings been given, would defendant have consented to the search. It may well be that, after being advised of his rights, he would have decided not to cooperate with the police in any way until he had a chance to confer with counsel. * * *
Reasonable minds may differ as to exactly what the Supreme Court attempted to achieve in Miranda. * * * However one interprets Miranda, what becomes subject to exclusion when a warning, is not given although the situation calls for one, are “statements, whether exculpatory or inculpatory, stemming from custodial interrogation.” * * * A consent to search, as such, is neither testimonial, nor communicative in the Fifth Amendment sense. If appearing in a lineup and speaking words used by a robber is not a “disclosure of any knowledge [the accused] might have” * * *, neither is a consent to search. The fact that the search leads to incriminating evidence does not make the consent testimonial, any more than the victim’s identification at the lineup gives such a quality to the words spoken by the suspect.
12 Cal.App.3d at 1110, 91 CahRptr. at 872. The court’s reference is to Schmerber v. California, 384 U.S. 757, 86 S.Ct. 826, 16 L.Ed.2d 908 (1966).
We conclude that a consent to search does not amount to a statement, either inculpatory or exculpatory, stemming from a custodial interrogation. It is neither “testimonial” noy “communicative” and therefore is not a statement against which Miranda was inténded to protect. When Ealy exercised his right to have an attorney present to protect his fifth amendment right against custodial interrogation, this did not bar the officers from requesting a consent to search and it did not automatically invalidate the voluntariness of his consent.
On the contrary, the record amply demonstrates that Ealy’s consent was not unfairly obtained. Ealy was not a youthful, inexperienced person, but a 55-year old man with several prior encounters with the police; he did not appear to suffer from low intelligence; he received advice as to his constitutional rights; he had not been detained for an undue period of time; and he had not been subjected to repeated or harrassing questioning. Schneckloth v. Bustamonte, supra, 412 U.S. at 226, 93 S.Ct. at 2047, 36 L.Ed.2d at 862 (1973). Both officers testified that Ealy appeared to understand his rights. Significantly, the consent form he signed advised of the right to refuse to permit the search and seizure, even though right of refusal is not constitutionally mandated. Schneckloth v. Bus-tamonte, supra, 412 U.S. at 231, 93 S.Ct. at 2049, 36 L.Ed.2d at 865; United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); State v. Edwards, supra.
Finally, we refer to thé trial court’s great discretion in evaluating the credibility of witnesses. State v. Wilson, supra; State v. Martin, 376 So.2d 300 (La.1979), cert, denied 449 U.S. 998,101 S.Ct. 540, 66 L.Ed. 2d 297 (1980). The court passed an implicit credibility call in favor of Officers Hayes and Baker, who testified as to Ealy’s apparent understanding. On this record we have no basis for disturbing the credibility call.
*1316 The trial court did not err in denying the motion to suppress. This assignment does not present reversible error.
DISCUSSION: SUFFICIENCY OF EVIDENCE
By his first two assignments of error, Ealy contends the jury’s verdict was contrary to the law and evidence and the trial court erred in not granting the motion to modify the verdict to manslaughter, LSA-C.Cr.P. art. 821 C. The comments to art. 821 C state that the standard imposed is sufficiency of evidence, and Ealy concedes this is the issue raised by both assignments.
The constitutional standard of review for sufficiency of evidence to support a conviction is whether, viewing the evidence in light most favorable to the prosecution, any rational trier of fact could have found that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. LSA-R.S. 14:30.1 A(l). Specific intent is the state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences of his act or failure to act. LSA-R.S. 14:10. Specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances of the transactions of the defendant. LSA-R.S. 15:455; State v. Graham, 420 So.2d 1126 (La.1982); State v. Fuller, 414 So.2d 306 (La.1982).
The statutory rule as to circumstantial evidence is that assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. LSA-R. S. 15:438. This statutory rule is not a purely separate test from the Jackson standard to be applied instead of a sufficiency of evidence text whenever the state relies on circumstantial evidence to prove an element of the crime. State v. Wright, 445 So.2d 1198 (La.1984). Ultimately, the Jackson standard is the objective standard for testing the overall evidence, direct and circumstantial, for reasonable doubt. State v. Wright, supra; State v. Nealy, 450 So.2d 634 (La.1984). The statutory rule provides an evidentiary guideline for the jury when considering circumstantial evidence and facilitates appellate review of whether a rational juror could have found the defendant guilty beyond a reasonable doubt. Exclusion of every reasonable hypothesis of innocence is therefore a component of the more comprehensive reasonable doubt standard, where circumstantial evidence is used to convict. Thus although the circumstantial evidence rule may not establish a stricter standard of review than the more general reasonable juror’s reasonable doubt formula, it emphasizes the need for careful observance of the usual standard and provides a helpful methodology for its implementation in cases which hinge on the evaluation of circumstantial evidence. State v. Nealy, supra; State v. Chism, 436 So.2d 464 (La.1983).
Viewed in this light, the evidence would have persuaded a rational factfinder that all elements of the crime were proved beyond a reasonable doubt. Ealy was living with the victim in a common-law marriage but by his own admission he was growing progressively more dissatisfied with her because of her dissolute lifestyle of prostitution, drugs and profligate spending. On the evening of the shooting he was upset with her for not sharing more of the proceeds of her latest trick. He had told her to take her belongings and leave. This concurrence of factors was sufficient to establish an atmosphere for the incident.
The forensic evidence very clearly shows that Ealy fired the .38 revolver through the truck’s window and at the victim. This is sufficient to prove specific intent to kill. State v. Procell, 365 So.2d 484 (La.1978), cert, denied 441 U.S. 944, 99 S.Ct. 2164, 60 L.Ed.2d 1046 (1979); State v. Eason, 460 So.2d 1139 (La.App. 2d Cir.1984), writ denied 463 So.2d 1317 (La.1985).
The forensic evidence also contradicts Ealy’s testimony that the gun accidentally discharged in the thick of a struggle with *1317 the victim. If the victim had been pointing the gun at Ealy when he “snatched” it, he could not conceivably have turned it around in his hand, cocked it and fired at four pounds pressure (or even fired it at twelve pounds pressure) “accidentally” in the split second of recoiling and tumbling backwards out the truck’s door. The wound’s large and ragged appearance was consistent with the bullet mushrooming before it struck her body, as by passing through a pane of glass. The lack of substantial gun powder residue on the victim and the uniform presence of glass particles on the surface of the bullet further indicate the gun was fired outside the truck. This evidence was sufficient to lead the jury to disregard Ealy’s story.
Ealy’s own statements and testimony were riddled with contradictions. First was the statement he gave the police on the day of his arrest, saying that someone had asked him to carry the wounded victim to the hospital. This was less credible than the version he advanced at trial, but by changing his story he probably persuaded the jury he was trying to conceal a criminal act. His testimony at trial was not totally credible either, and even his attorney asked the jury to disregard Ealy’s statement that he had taken exactly one sip of bourbon on the evening of the shooting. His testimony also raised several unanswered questions. For instance, the mysterious people “Brenda” and “Brayboy” were close to the victim in the final hours of her life, but Ealy only mentioned them and did not attempt to substantiate their roles in the incident. Ealy did not explain how the victim’s pistol, which she always carried in her purse or stuffed between the mattresses, conveniently appeared under the beer rack in his truck just before the shooting. Much more credible, in light of the other evidence, were the statements Ealy made in the heat of excitement following the incident and the chaotic trip to the hospital, and overheard by Charlotte Parish and Cheryl O’Neal: “I shot the bitch; I hope she dies” and “This [pistol] is what I shot the bitch with.” R.p.p. 347, 284.
In light of this evidence the trial court did not err in refusing to grant a new trial or modify the verdict. There was ample evidence to persuade a reasonable factfinder beyond a reasonable doubt that Ealy killed the victim with specific intent to kill or commit great bodily harm.
Ealy finally contends that he was improperly required to prove a sudden passion combined with provocation to make his case for manslaughter, LSA-R.S. 14:31, in contravention of due process. Mullaney v. Wilbur, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). Due process requires the state to prove every element of the crime beyond a reasonable doubt; if heat of passion or sufficient provocation is an additional element of the offense of manslaughter, then the state must disprove it. However, our supreme court has squarely held that passion is not an additional element of manslaughter. State v. Lombard, 486 So.2d 106 (La.1986); State v. Tompkins, 403 So.2d 644 (La.1981); State v. Peterson, 290 So.2d 307 (La.1974). It is a mitigating factor reflecting a lesser degree of culpability; the defendant is not required to prove it. Instead, the jury is free to infer the mitigating circumstances from the evidence. State v. Lombard, supra; State v. Butler, 503 So.2d 1027 (La.App. 2d Cir.1987); State v. Landry, 499 So.2d 1320 (La.App. 4th Cir.1986). The question for the reviewing court is whether a rational trier of fact, viewing the evidence in light most favorable to the prosecution, could have found that the mitigating factors were not established by a preponderance of the evidence. State v. Ruff, 504 So.2d 72 (La.App. 2d Cir.1987), writs denied 508 So. 2d 64, 65 (La.1987).
We have already summarized the overwhelming forensic evidence that Ealy shot the victim from outside the truck, his changed version of events, and the other inconsistencies in his testimony. From this the jury was entitled simply not to believe his account of how the victim provoked him. LSA-C.Cr.P. art. 802(3); see also State v. Prestridge, 399 So.2d 564 (La. 1981). Considering the totality of evidence, we readily conclude that a rational trier of fact could have determined that the miti *1318 gating factors, reasonableness of provocation and heat of blood, were not established by a preponderance of evidence. State v. Lombard, supra; State v. Butler, supra. The evidence was legally sufficient to convict Ealy of second degree murder.
These assignments do not present reversible error.
For these reasons, Ealy’s conviction and sentence are affirmed.
AFFIRMED.
ON APPLICATION FOR REHEARING
Before JASPER E. JONES, FRED W. JONES, NORRIS, SEXTON and LINDSAY, JJ.
Rehearing denied.

. The two states so holding are Oklahoma and Oregon. See Schorr v. State, 499 P.2d 450 (Okla.Crim.1972); State v. Williams, 248 Or. 85, 432 P.2d 679 (1967).