476 So.2d 413 (1985)
STATE of Louisiana, Appellee,
v.
David Gene McFADDEN, Appellant.
No. 17156-KA.
Court of Appeal of Louisiana, Second Circuit.
September 25, 1985.
*415 James Askew, Shreveport, and M. Randal Fish, Bossier City, for appellant.
William J. Guste, Jr., Atty. Gen., Baton Rouge, Paul J. Carmouche, Dist. Atty., and Scott J. Crichton, Asst. Dist. Atty., Shreveport, for appellee.
Before MARVIN, JASPER E. JONES and SEXTON, JJ.
MARVIN, Judge.
Defendant McFadden appeals his conviction by jury verdict of 2nd degree murder of a 29-year-old mother and argues five assignments of error.
Two of defendant's assignments question the sufficiency of the evidence to convict. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); LRS 15:438. Defendant's other assignments question the admissibility of, and the alleged unfair curtailment of cross-examination of, an investigator's conclusion that the body was dragged through a pool of blood; the admissibility of telephonic statements made by defendant to another investigator before defendant was arrested; and the admissibility of loan applications made by the victim's husband after the homicide occurred.
We find no reversible error in the rulings of the trial court regarding admissibility. We review the sufficiency of the evidence and affirm the conviction.

FACTS

THE VICTIM'S SON
The nine-year-old son of the victim awoke on a school day, March 2, 1983, and discovered on the floor in the den of their family home the blood smeared and essentially nude body of his mother. She was laying face up adjacent to a pool of blood with her buttocks and torso elevated by a sofa cushion about 4 inches thick, her knees flexed and apart. The cut throat of the victim, with only the rear 20 percent of the circumference of the neck intact, was emphatically *416 evident because her head was slightly extended backward by the position in which she lay.
Shocked by what he had seen, the son ran to a neighbor's home, screaming, "Mama's dead, mama's dead!" Within minutes of the neighbor's telephone call, investigation into the murder began.

THE INVESTIGATION
Identification experts made still pictures, videotaped the victim's home, and searched for evidence. A partial print of a bloody tennis shoe was found which was later determined could have been defendant's shoe. The home had not been ransacked by the murderer, but appeared in its ordinary state, somewhat cluttered and not perfectly kept or clean. Fingerprints were not found on the terrazzo floor of the den because it was dirty and gritty. A fingerprint found on a glass in the kitchen of the house was later determined to be defendant's print. The bathtub held several plastic containers filled with water. The bathroom sink faucet was discharging a small stream of water onto a washcloth. A drain hose was connected to the washing machine and extended through the back screen door and into the yard where it had drained rinse and wash water. Clothes, damp from a recent washing, were found in the washer. Uneaten remains of a salad were found in a styrofoam container sitting on a dresser that faced the wall in the back bedroom of the home. A cold drink cup from a Wendy's restaurant sat on the TV in the den.
The son had come home from school on Tuesday, March 1, and found a handwritten note from his mother directing him to stay there until she returned about 9 p.m. He said his mother came home about 10:20 p.m. while he was watching the news on television. During their conversation, she told him she was not in a very good mood and suggested it was his bedtime. After retiring to his room he heard her loading and starting the washing machine. Without looking at the clock, he awoke sometimes during the night because he heard the creaking of the back screen door, through which the drain hose extended. Before going back to sleep he heard what he described as "the little knife drawer" in the kitchen being opened.

THE NEIGHBORS
Another neighbor saw the victim driving her car and parking it in the driveway of the victim's home between 10 and 10:25 p.m. The victim appeared to be alone in the car. While reading a book about 11 p.m., a third neighbor who lived next door to the victim heard a vehicle drive into the victim's driveway and the door of that vehicle open and shut. The neighbor to whom the son ran screaming after discovery of the body said he was awakened about 1:30 a.m. that night by his dog barking and "going crazy" inside his home in response to dogs barking in the neighborhood. He reported this incident to the sheriff's office because he had chased a prowler off his property about two months before and surmised that another prowler was in the vicinity.

THE VICTIM
The 29-year-old victim and her second husband, J. D., had been estranged for about three months and their separation trial was scheduled on March 3, a day after her body was discovered. The victim had subpoenaed defendant on March 1 to be her witness in that scheduled trial.
The victim belonged to an exercise salon where she had worked out almost daily for about four or five years. She went to the exercise salon about 6 p.m. and stayed until it closed about 7 p.m. on March 1. Sometime before 9 p.m. the victim bought a red skirt at a store in a Shreveport shopping mall. The clerk at the store accepted the victim's check and wrote the number of two charge cards of the victim on the check.

SCIENTIFIC INVESTIGATION
Two autopsies were conducted. Dr. Braswell, then Caddo coroner, performed the first autopsy on March 2. Dr. McCormick, a forensic pathologist, performed the second on March 5.
*417 Dried blood covered much of the face and neck of the victim's body, the remainder of which was randomly covered with blood smears. The knife used on the victim had a "short" blade (3"-4") and was applied with great force, "to the hilt," as evidenced by a smear of blood in the shape of a fist over a stab wound on the body.
The victim's neck was lacerated by four different cuts and to 80 percent of its circumference. These cuts extended through her carotid artery and through or partially through her larnyx, pharnyx, trachea, and other jugular vessels. One incision or stab-type wound in her left shoulder followed the path of one of the cuts through her throat. She was stabbed twice in the chest.
Fingernails of a forceful and clutching hand left abrasions and contusions on her face, her left knee, and just above and below her right knee. A contusion was also found over her left collarbone, her right collarbone, and on each side of her frontal pelvic area. Closer examination of her throat also revealed that fingernails of a forceful and clutching hand caused abrasions and contusions, a fracture of the hyoid bone of the neck which anchors the trachea and other structures of the neck. Her neck was forcefully dislocated and her spinal cord was compressed where the first cervical vertebra was separated from the base of the skull.
Two or more stellate lacerations and skull fractures were found at the back of her head with resulting brain hemorrhage. These injuries were caused by her head being forcefully banged against the floor by the hand or hands at her throat. Her hair was matted with blood.
The area around her right thumb was deeply bruised and her hand held strands of her own hair. Her stomach contained fragments of a partially undigested leafy and bean salad.
Ecchymosis found in her vaginal area was caused by someone's performance of cunnilingus. Semen and sperm in her vaginal vault revealed the victim had also had sexual intercourse either before or after her death.
No semen was found on the exterior of her body or on her panties which were laying in a pool of blood near her head. Experts concluded the semen was deposited in her body, either before or after her death, and that she did not rise from her prone position. No blood or semen was found on the cushion supporting the buttocks of the body.
The victim died of cardio-respiratory arrest (the stoppage of the heart and lungs), caused by the manual strangulation and compression of the spinal cord that occurred when her head was forcefully struck several times against the floor, dislocating her neck and fracturing her skull. The great quantity of the blood on the floor of the den came from the lacerations to the head. Her throat was cut after her heart had ceased pumping and the stab wounds were inflicted after she was dead. Dr. Braswell concluded that death occurred about midnight, give or take two hours.
Body specimens obtained from the victim, her husband, and the defendant were subjected to analysis by the crime lab. Comparative serological analysis of the large quantity of semen in the vaginal vault revealed that the donor could have been McFadden and could not have been the victim's husband.
Laser examination showed no semen on the victim's body outside the vaginal vault and none on the blood soaked panties or other clothing of the victim. Analysis of scrapings from under the fingernails of the victim revealed the presence of some skin and blood tissue, otherwise unidentifiable.
Blue jeans McFadden wore on the night of March 1 and his tennis shoes were examined. Examination was also made of tennis shoes worn by others known to have walked on the bloody floor of the den after the murder was discovered. All tennis shoes but McFadden's were eliminated as being the type capable of making the bloody shoe print found near the body.
*418 McFadden's blue jeans had been laundered before the crime lab examination. A small trace of a blood stain, however, was found to be human blood, otherwise unidentifiable because it was weak or faint as a result of being laundered. A small dried fleck of blood found on McFadden's tennis shoes was also serologically tested. This blood was not McFadden's blood type, but was the rare type of the victim, a type found in less than five percent of the population.

THE VICTIM'S HUSBAND
The estranged husband worked his shift at a Shreveport manufacturing plant from 4 p.m. March 1 to 12:30 a.m. on March 2, clocking in and out. Shortly thereafter at 12:41 a.m. he made a small cash withdrawal from an automatic bank teller in southwest Shreveport and then saw one or more of his co-workers at a nearby restaurant where he ate and visited with a waitress. He left the restaurant and went to a nearby grocery. There he purchased a box of cereal at 1:57 a.m., according to the cash register receipt, and visited with the cashier-clerk. Witnesses corroborated the husband's whereabouts and activity to this point.
After leaving the grocery store in southwest Shreveport, the husband drove several miles to the area of Keatchie where he had lived in a mobile home since he and his wife separated. This home was located behind the home of his step-mother. He estimated that he arrived there about 2:30 a.m. His step-mother found him there about 7:30 a.m. and woke him after she learned of the murder.

DEFENDANT'S TELEPHONE STATEMENTS: DEFENDANT'S ASSIGNMENT TWO
An employee of the victim's exercise salon told sheriff's investigator Bostick on March 2 that she had received a telephone inquiry about the victim about 11 a.m. on Tuesday, March 2, from a man who identified himself as David McFadden.
Bostick then telephoned McFadden's residence at 7 p.m. to inquire whether he made the earlier call to the exercise salon. McFadden acknowledged making the call and Bostick made arrangements to meet him within an hour to talk further. Neither mentioned that a homicide had occurred.
At 8 p.m. Bostick again telephoned McFadden to make arrangements to talk to him other than by telephone. In this conversation, McFadden said he had "just learned" of the death and acknowledged that he had worked at one time with the victim and her husband but had not seen her since January and had not talked to her since mid-February when she called him and asked about him testifying at the separation trial. McFadden told Bostick he went jogging on the night of March 1, but jogged only about 200 yards and became frightened when he saw a black man behind a tree on the Clyde Fant Parkway and returned home. Admission of these conversations over defendant's objection provoked defendant's second assignment of error.

OTHER STATEMENTS
On March 4, after giving body samples (blood, saliva, pubic and head hair, and fingernail scrapings) to the crime lab technicians, having his brother's truck and their home searched, McFadden gave recorded statements to Bostick and other investigators at the sheriff's office. The first statement was taken between 5:45 and 6:30 p.m. The second was taken at 9 p.m.
In the first statement McFadden admitted being with the victim in her automobile and in her home on Monday afternoon, February 28, and declined her offer to have sexual intercourse with him in return for his testifying for her in the divorce action. By the time of the March 4 statements, McFadden was aware of the officer's curiosity about abrasions and fingernail scratch marks on his arms, abrasions on each of his knees, and cuts or incisions on his hand. McFadden explained that the black man he had said he encountered on the Parkway on the night of March 1 had attacked him and caused most of the *419 marks on his body. Other marks he attributed to his doing yard work. He explained the cuts on his hand by saying he had burned himself by grabbing a pot handle. He did not mention an accidental cutting of his hand with a knife and he expressly denied being scratched by the victim.
After specimens were taken from his body at the crime lab, McFadden told Bostick that he wanted to make another statement. This statement was recorded about 9 p.m. In this statement, McFadden explained that he had lied about that black man, that he had gone to the victim's home about 10:30 p.m. on Tuesday, March 1, that after accidentally scratching him when he resisted her advances, the victim convinced him to have intercourse with her on the bed in the back bedroom, asking him to leave shortly afterwards because he continued to insist that he would testify for both parties in the divorce. He said she was alive and dressed in a housecoat or robe when he left her near the front door of the home. (She wore a partially torn and thrown open robe when her body was found.) He said he arrived at his home about 11:15 p.m., but made no mention of a 3½ hour telephone conversation he said at trial that he had shortly thereafter with the mother of his girlfriend.
At trial, McFadden explained that when he gave the 9 p.m. recorded statement on March 4 to the investigators he made no mention because he "didn't remember" the 3½ hour telephone conversation on the night and early morning hours of March 1 and 2, also saying, "I didn't know it would be relevant ..."
Defendant argues that the telephone conversations he had with Investigator Bostick on the night of March 2 were not admissions as that term has been defined by LRS 15:449 and by cases such as State v. Jones, 451 So.2d 35 (La.App. 2d Cir.1984). Defendant's ultimate argument in this respect is that the State was allowed to introduce the telephone statements during its case in chief to circumvent the rule against impeachment of a witness before he is sworn (LRS 15:484), thereby forcing the defendant to take the witness stand to explain why the false statements were made, contrary to his constitutional right against self-incrimination.
The trial court did not err in admitting the telephone statements. The statements meet the case law definition because they admit of circumstances from which an inference of guilt might be drawn, such as the desire of the defendant to suggest an alibi. Compare State v. Roshto, 222 La. 185, 62 So.2d 268 (1952), where defendant argued that his exculpatory "yarns" (as he later called them) were not admissions, were not part of the res gestae, and were used only to show their falsity and cast guilt upon defendants. The court answered that evidence of exculpatory, but false, statements is competent and admissible to establish some inference of guilt. The prosecution may prove such declarations of the accused, and then prove their falsity. 62 So.2d at pp. 270-271.
Additionally it has been said, "when introduced in ... the State's case-in-chief, inconsistent statements, whether inculpatory or exculpatory, are not subject to the procedural rules governing impeachment of witnesses." State v. McDonald, 387 So.2d 1116, 1121 (La.1980). See also Wigmore, Evidence, §§ 1048-49 (Chadborn Rev.1972). State v. Jones, supra, is not to the contrary and does not support, even inferentially, defendant's argument.

LT. HOOD'S TESTIMONY: DEFENDANT'S ASSIGNMENT ONE
Lt. Hood, supervisor of the sheriff's ID section and a veteran of more than 25 years service with the Shreveport police and Caddo sheriff, was not initially tendered as an expert witness in blood transfer or splatter analysis.
When explaining what the photographs and the videotape showed, without objection from defendant, he testified about the "substance or the blood" being quite an amount of blood and that the body appeared to have been moved or slid. When Lt. Hood was asked about "drag marks" through the pool of blood near the body, *420 defendant then objected that Lt. Hood should not express an opinion as to what the videotape depicted unless he was qualified as an expert in the analysis of blood stains and splatters. Defendant's assignment two arose when the trial court overruled defendant's objection about the drag marks.
Lt. Hood then testified about the drag mark that appears in the photographs and videotape. This court has viewed the photographs and the videotape. It is obvious to this court that "something has been dragged ... through [the] pool of blood" near the body, which was Lt. Hood's answer to the question that provoked defendant's assignment.
The objections and the context in which they were made by the State to questions to Lt. Hood while on cross-examination by the defense were as follows:
Q. If the sheet were placed over ... the body, wouldn't you expect some blood to get on the sheet?
A.... it would be my opinion ... some would ...
Q. Would ... that sheet ... get in that blood?
OBJECTION: Speculation ... opinion
THE COURT: Sustained.

Q. If someone put a sheet over the body and it did get in the blood, would that alter your crime scene?
A. It would alter some of the smear-type marks ... within that blood ...
Q. And might it also make ... dragging marks across it ...?
OBJECTION: [As above]
SUSTAINED.
Q. You will admit anything ... placed on the body would ... or could alter your crime scene?
OBJECTION: [As above]
OVERRULED.
A. Any that touched it could alter it, if it had smears in it. * * *
Q. You testified [on direct] ... that that looked like something had been drug through the blood?
A. That's correct.
Q. Could that have been a sheet?
OBJECTION:
OVERRULED.
A.... it would have to be something heavier than a sheet.
As Lt. Hood was being questioned about what the photograph or videotape depicted he replied that the blood [pool or spot] either was "dropped off ... straight down [or] had ... flowed". Lt. Hood was questioned as to where the pool of blood was more concentrated. Defendant's objection to Lt. Hood's testimony about finding where the center of the blood related to the place where the victim's head was struck was sustained.
In State v. Williams, 353 So.2d 1299 (La.1977), cert denied, 437 U.S. 907, 98 S.Ct. 3098, 57 L.Ed.2d 1138 (1978), over defendant's objection, an investigator testified that drag marks on the porch of defendant's home "appeared to be heel marks as though someone had been dragged from the front door to the edge of the porch." The court said:
Reasonable inferences from facts may be drawn by witnesses sufficiently knowledgeable and experienced with the subject matter; permitting such an inference to be drawn will ordinarily fall within the sound discretion of the trial judge. The common sense inference drawn by this officer who had participated in this investigation was permissible. 353 So.2d 1305, 1306
See also State v. Alexander, 430 So.2d 621 (La.1983); State v. Kahey, 436 So.2d 475 (La.1983).
The trial court did not abuse its sound discretion by permitting Lt. Hood, a knowledgeable and experienced investigator, to make reasonable inferences from his own observations at the crime scene whether a particular item of blood was a drop, smear, flow, or pool. Lt. Hood's deduction that something had been dragged through the blood does not bear on the ultimate fact and is patent to the jury from an examination *421 of the photographs or the videotape. Other witnesses spoke of the drag mark.
The record does not support, but refutes, defendant's argument that his right of cross-examination was unfairly curtailed and prejudicial to him. This assignment does not present error.

THE HUSBAND'S LOAN APPLICATIONS: DEFENDANT'S ASSIGNMENT THREE
After the husband testified and was subjected to extensive cross-examination covering the dates, amounts, and purposes of loans he had made from the employee's federal credit union through his employment, the manager of that credit union was called by the State. She had supervision of the records of the credit union and authority over the several loan officers who approved the loans.
The defense mentioned the husband's loan record in its opening statement. The manager testified to the pertinent detail of each loan from the credit union's file on the husband, "all of the documents ... pertinent to the records of [the husband]." The manager was cross-examined on loans made by the husband from 1976 through the trial date in 1984.
After the manager was excused from the witness stand, the State offered the entire file of the husband from which the manager had been testifying and which she had identified as State's Exhibit No. 124. The court inquired "Any objections?" The defense answered, "Other than the loan applications being hearsay, we note our objection for that."
On appeal, defendant asserts that the loan record or file of the husband was hearsay and that the State failed to establish the required foundation to admit the loan applications under the business record exception to the hearsay rule.
Under the circumstances of this record, we find defendant's assignment not to constitute reversible error. We agree with defendant's statement in brief that "the person who made the entry concerning the purpose for [each] loan was [the victim's husband] and that he was certainly available to testify." Defendant's argument is that the business record is inadmissible unless it is shown, among other things, that the person who made it [in this instance, the victim's husband] is genuinely unavailable to testify. State v. Monroe, 345 So.2d 1185 (La.1977).
Louisiana has taken the conservative view toward applying the business record exception to the hearsay rule in criminal cases because the exception infringes on the defendant's constitutional right to confront and cross-examine his accusers. Monroe, supra. Here the records in question did not in any way implicate or accuse the defendant but related only to what the victim's husband, or someone for him, wrote was the purpose of each loan he made from his credit union, a thing the husband had difficulty in remembering while testifying.
Defendant was not deprived of his right to confront and cross-examine either the victim's husband or the manager-custodian of the husband's records at the credit union about the purpose of each loan made by the husband. The loan applications that the husband signed for the credit union contained the written statement of the "purpose" of each loan. Defendant used the details of the husband's loan record in an attempt to impeach the husband's credibility on cross-examination and to suggest that the husband had a motive to commit murder. Evidence that may corroborate a witness whose credibility has been assailed may be thereafter admitted. Prior consistent statements may be admitted. LRS 15:485, 496, 497. Whether the evidence is relevant for the purpose for which it is introduced is left to the sound discretion of the trial court. LRS 15:441, 435. State v. West, 419 So.2d 868 (La. 1982). We find no error in this assignment.

SUFFICIENCY OF THE EVIDENCE: DEFENDANT'S ASSIGNMENTS FOUR AND FIVE
Defendant contends the evidence was not legally sufficient to convict under LRS *422 15:438, Jackson v. Virginia, supra, and its Louisiana progeny (Assignment 4) and, for that reason, the trial court erred in not granting his motion for a new trial (Assignment 5).
Defendant argues that the State's evidence does not exclude the reasonable possibility that someone else murdered the victim after he said he left her alive and well about 11 p.m. Defendant suggests the hypotheses are reasonable that either the husband, by his own hand or through the hand of another, or a prowler who entered the home, committed the murder.
The husband's whereabouts on the night of the murder were well corroborated until he left the grocery store shortly after 1:57 a.m. where he purchased cereal. The jury could have concluded from Dr. Braswell's testimony and others that the victim was dead by this time or could have concluded that the victim's husband testified truthfully when he said he arrived home about 2:30 a.m. and went to bed and that he did not kill his wife. Such a conclusion by the jury would be eminently reasonable.
Likewise, from the testimony of Dr. McCormick and the circumstances in which the body was found, the jury could have concluded that this was not a hired or contract killing. Dr. McCormick testified that his studies and experience have disclosed that contract killings are done much more professionally, cleanly, and without "display." Contract killers kill more professionally and do not leave trace evidence. A display killing, on the other hand, was explained as one that is committed by a killer with a subconscious desire to shock persons who might encounter the body. The victim was either dead or in the throes of death when she was stabbed and when her throat was widely and deeply cut several times. Her body was dragged through her blood about 18 inches and was placed upon the chair cushion. No blood or semen was found on the cushion. The killer dragged the body to the cushion and placed the victim's knees in a flexed and open position with his bloody hands.
A conclusion by the jury, under these circumstances, that the killing was a display killing, and not a contract killing, would be eminently reasonable.
The jury, likewise, could have concluded that this was not the work of a prowler, notwithstanding that the victim's purse was never found and the back door of the house was not locked. The house was not ransacked. The house contained other items, some jewelry and things of minor value which were untouched. The victim died by the hand of a person who choked and strangled her from the front while beating her head against the floor. The murderer entered the home and did the deed without any outcry by the victim. The victim's son was awakened, not by an outcry or by the noise of a struggle, but by the creaking of the back door. A conclusion by the jury that the killing was not done by a prowler would be eminently reasonable.
The jury could have concluded that the defendant committed the crime. He became friends with the victim and her husband two years before the murder when they worked together at a Shreveport manufacturing plant from which the defendant and the victim were later laid off. He admitted to several telephone conversations with her after she and her husband were estranged. She had told McFadden some of the intimate and apparently embarrassing details of her life (that she had a venereal disease and that her husband would be required to be tested). For whatever reason, she believed McFadden knew of some infidelity by her husband. She discussed with McFadden his testifying against her husband. McFadden was reluctant to agree to do so.
At 6 p.m. on March 1, 1983, McFadden was served with a subpoena to be a witness for the victim in the separation trial scheduled two days later. McFadden's brother said that McFadden said he did not want to testify for either party, he didn't think it "right" for him to testify for her and not for her husband, and appeared upset, agitated, *423 and aggravated because he had been served with the subpoena.
McFadden knew how to reach the victim by telephone at the exercise salon. She was there until 7 p.m. on March 1. Her whereabouts, thereafter, except between 9 p.m. and 10:20 p.m., were traced. When she arrived home about 10:20 p.m. she said she was not in a good mood.
Sheriff's investigator Bostick first telephoned McFadden at 7 p.m. on Wednesday, March 2, a day after he had been served with the subpoena. McFadden then knew the victim had been murdered. Both his brother and a friend told him of the death before Bostick telephoned at 7 p.m. and inquired why McFadden had called the exercise salon earlier in the day. McFadden did not mention the fact of the subpoena or inquire about the investigation of the murder.
When Bostick called again at 8 p.m. McFadden said he had "just learned" of the victim's death. When Bostick asked about his whereabouts the night before, McFadden fabricated the lie about being scared when jogging past a black man behind a tree.
In the 5:45 p.m. statement on March 4, and after the scratches on his arms, cuts on his fingers, and abrasions on each knee had been viewed and photographed by investigators, defendant expanded the lie about the black man on the jogging trail in an attempt to explain that the scratches and cuts on his arms and hands were caused by an attack by the man. He also told about being with the victim on Monday, February 28, and refusing her overture to have intercourse.
After defendant gave body specimens to the crime lab, however, he asked that he be allowed to make another statement. This was the 9 p.m. or second recorded statement. In this statement he attempted to explain how the victim had scratched him and why his semen might be found in her body. He did not then mention the alibi he used at trial about having a 3½ hour telephone conversation, but simply said he returned home that night about 11:15 p.m. He admitted his earlier and obvious lies. He said he intended to go jogging after he left the victim but had forgotten his tennis shoes.
At trial defendant attempted to explain that the cuts on his hands happened while he was peeling potatoes and he testified to the 3½ hour telephone conversation that he said began about 11:30 p.m. on March 1.
Dr. McCormick examined the wounds on defendant's hands, arms, and knees on March 7. As an experienced forensic pathologist, he opined that the cuts on the defendant's hand could have come from gripping a knife but not from any burns, that the scratches on defendant's arms and wrists were made by fingernails of a clutching hand, and that the abrasions on each knee were consistent with having intercourse on a hard floor. At trial McFadden said his knees were abraded when he fell on a stairway. Dr. McCormick also opined that the deep bruises on the victim's right thumb were consistent with her fighting off her attacker.
On the night of March 1, McFadden told his brother he wanted to borrow his truck to go jogging. The next time he conversed with his brother, which was on the night of March 2, and before he talked to Investigator Bostick the first time, he told his brother that the obvious wounds on his arms and hands were caused by the black man on the jogging trail. On March 5, after he had given the recorded statements on March 4, he told his brother that the victim had scratched him to cause the wounds and that she had voluntarily had intercourse with him. Sheriff's investigators did not tell McFadden that his fingerprint was found on a water glass in the victim's home. Once he realized the significance of being fingerprinted, he told the investigator in the first recorded statement that he had been in the victim's home on February 28 where he drank a glass of water. He expressly denied having intercourse with the victim until his body samples were obtained at the crime lab.
*424 In short, as McFadden realized or imagined the development of possible incriminating evidence that might trace his conduct on the night of March 1, he changed his story in an effort to avoid the incrimination. He testified that he was "scared to death" when he said in the second telephone call he just learned of the murder on the night of March 2, because he had been with her on the night of the murder. In his recorded statements on March 4, he did not mention the alibi telephone conversation he testified about at the trial.
Under these circumstances, the jury could have rejected McFadden's testimony and his alibi as being unworthy of belief. Such a rejection would be eminently reasonable.
The fleck of blood that was tested by the State's serologist was barely enough to make the two tests necessary to tell whether it was the victim's blood type. Defendant's serologist, at a later time, agreed "no doubt" that the small amount of blood left to test was human blood and that it could have been the blood type of the victim, but could not conclude that it was the blood type of the victim, as the State's serologist said it was. The defendant's serologist also agreed that semen found inside the victim could have been deposited by McFadden, but not by the victim's husband, assuming a single donor.
Defendant's serologist said he could not make the conclusion that the victim or her body remained in the prone position after the semen was deposited, as the State's serologist and pathologist had concluded, because of such variables as the amount of semen and the physical makeup of the vagina. Defendant's expert said "common sense" would dictate the variables. The jury knew that the State's experts had observed the victim's body and the quantity of semen and that defendant's expert had not.
Under these circumstances, the jury could have given more weight to the fact and to opinion evidence and reasonable inferences based on fact that was expressed by the State's witnesses than by defendant's witnesses. Such a conclusion by the jury would be eminently reasonable and within the jury's province. The jury may weigh and accept or reject, in whole or in part, the testimony of any witness, lay or expert. CCrP Art. 802(3), State v. Square, 257 La. 743, 244 So.2d 200 (1971).

SCOPE OF REVIEW
Circumstantial evidence is not inherently less reliable than direct evidence. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954); CCrP Art. 798(3); State v. Chism, 436 So.2d 464 (La. 1983). Any man would accept dog tracks in the mud against the sworn testimony of a hundred eyewitnesses that no dog passed by. The gist and the key to circumstantial evidence is the inference or process of reasoning by which the conclusion is reached. Chism, supra, at p. 469.
LRS 15:438 is an evidentiary guide for the jury and a tool or methodology for the reviewing court to employ in determining whether the rational juror in the Jackson v. Virginia constitutional due process test might have concluded that defendant's alternative hypothesis of innocence is sufficiently unreasonable to conclude that the evidence proved guilt beyond a reasonable doubt. State v. Chism, supra; State v. Wright, 445 So.2d 1198 (La. 1984); State v. Captville, 448 So.2d 676 (La.1984).[1]
*425 The test, whether expressed in terms of doubt or of hypothesis, is the reasonableness of the ultimate conclusion on the facts and inferences which may be drawn from those facts in the particular case. Compare State v. Shapiro, 431 So.2d 372 (La.1982), and State v. Rault, 445 So.2d 1203 (La.1984). In some cases, "the defendant's circumstantial theory [or hypothesis] is [found to be] remote [or unreasonable]..." when it is compared "... with the prosecution's hypothesis of defendant's guilt, which is consistent overall with the evidence." State v. Graham, 422 So.2d 123, 130 (La.1982).
We agree that lies by a defendant, while sufficient to support a "guilty mind," alone, are insufficient to convict, as in Shapiro, supra. See fn. 4, Captville, supra, p. 680. In Shapiro, the hypothesis of suicide was equally reasonable with homicide.
Here we have a victim slain by the hand of another, face to face, forcefully, violently. The hypotheses suggested by defendant, which were argued to but rejected by the jury, are unreasonable when compared with the hypothesis of the State which is consistent with the overall evidence.
It is possible either that the husband, directly or indirectly, or someone else killed this victim after defendant says he left her home. Each of these hypotheses, however, is remote in the light of, and is inconsistent with, the totality of the evidence, and each is founded on the truth of the defendant's testimony. These hypotheses and defendant's credibility were not accepted by the jury, however, for reasons we believe were dictated by the weight of the evidence.
Defendant argues that such things as fingerprints of others, known and unknown, in the victim's home, the absence of the murder weapon and its being connected with him, the absence of a motive and of blood in the truck, should demonstrate the legal insufficiency of the evidence to convict. These arguments essentially reflect on the weight to be given to the particulars of the evidence. These arguments were made to, and rejected by, the jury.
We find the jury's rejection of defendant's arguments to be reasonable in the light of the total evidence. The jury could have reasonably concluded that McFadden struggled with the victim and she with him; that he killed her, manipulated her body, and left the home, but with her telltale *426 marks on him, and failed to detect and remove a fleck of her blood that remained on his tennis shoe.
We find the jury's ultimate conclusion that McFadden murdered the victim to be eminently rational and reasonable. We conclude that the State proved its case by legally sufficient evidence, and AFFIRM the conviction.
NOTES
[1] Some cases suggest a stricter standard of review in circumstantial evidence cases. State v. Alexander, 437 So.2d 991 (La.App. 3d Cir.1983). See also State v. Williams, 423 So.2d 1048 (La. 1982), which speaks of "greater protection against erroneous convictions based on circumstantial evidence than is provided by the Fourteenth Amendment." Shapiro hints, in dicta, that a conviction might pass muster under Jackson as a matter of due process, but not under statutory law, LRS 15:438.

Later cases suggest that LRS 15:438 is but a component of the broader Jackson inquiry and may not create a stricter standard. See State v. Nealy, 450 So.2d 634 (La.1984); Wright, Chism, and Captville, supra. See also Joseph, Developments in the Law 1982-1983, Postconviction Procedure, 44 La.L.Rev. 477 (1983).
Judges and justices have often emphasized in majority and in concurring opinions that when there remains a reasonable hypothesis of innocence, the prosecution has necessarily failed to prove every element of the crime beyond a reasonable doubt. See, e.g., Denby v. State, 654 S.W.2d 457 (Tx.Crim.App.1983), United States v. Bell, 678 F.2d 547 (5th Cir.1982); United States v. Marx, 635 F.2d 436 (5th Cir.1981); and Shapiro, supra. The Denby court said:
... in actually assessing the evidence, no method other than a process of eliminating the guilt of others under the evidence could be fashioned to effectively conclude the evidence rationally established [defendant's] guilt beyond a reasonable doubt ... Stated in the converse, if the evidence supports an inference other than the guilt of the appellant, a finding of guilt beyond a reasonable doubt is not a rational finding ... there are no better analytical guidelines for assaying whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt in any given conviction had upon circumstantial evidence than those we currently employ. 654 S.W.2d at 464.
As a reviewing court, we are to assume as proven all basic facts which the evidence tends to prove. We are to then evaluate the reasonableness of inferences that the jury drew or could have drawn from these basic facts to determine whether the essential elements of the crime have been proved beyond a reasonable doubt. A rational juror can reject testimony as establishing no facts and refuse to infer from these unestablished facts that a reasonable hypothesis of innocence exists. The juror can refuse to accept factual inferences from established facts and, for this reason too, can find that no reasonable hypothesis of innocence exists.
Our opinion is that LRS 15:438 is a tool to aid and direct the trier of fact and the reviewing court to determine whether every element of the crime has been proven beyond a reasonable doubt. In this context, § 438 is but a reminder of "the need for careful observance of the usual standard ... in cases which hinge on the evaluation of circumstantial evidence." Chism, supra, at 470. The now statutory standard was applied years before the adoption of LRS 15:438 by Act 2 of 1928. See State v. Vinson, 37 La.Ann. 792 (1885); State v. Allen, 129 La. 733, 56 So. 655 (1911).