# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-456


**STATE OF LOUISIANA**

**VERSUS**

**JOENELL RUBIN**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 12-K-1661-C
HONORABLE ALONZO HARRIS, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**JOHN E. CONERY**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and John E. Conery, Judges.

Thibodeaux, Chief Judge, dissents and assigns written reasons.


**AFFIRMED WITH INSTRUCTIONS.**

**Edward John Marquet**
**Attorney at Law**
**405 West Main Street, Suite 104**
**Lafayette, Louisiana 70501**
**(337) 237-6841**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **Joenell Rubin**

**Earl B. Taylor**
**District Attorney – 27th Judicial District Court**
**Jennifer Ardoin**
**Assistant District Attorney – 27th Judicial District Court**
**Post Office Drawer 1968**
**Opelousas, Louisiana 70571**
**(337) 948-0551**
**COUNSEL FOR APPELLEE:**
      **State of Louisiana**

**CONERY, Judge.**

On July 19, 2012, Defendant, Joenell Rubin, was charged by grand jury indictment with the May 21, 1988, first degree murder while in the commission of the aggravated rape of Brenda Dupont, in violation of La.R.S. 14:30(A)(1).

On January 27, 2016, a 10-2 jury found Defendant guilty of the first degree murder of Brenda Dupont. On February 18, 2016, Defendant was sentenced to life imprisonment at hard labor without benefits and with credit for time served from the date of arrest.

Defendant now appeals his conviction and sentence, alleging two errors. For the following reasons, we affirm Defendant's conviction and sentence. We instruct the trial court to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of the opinion and to file written proof in the record that Defendant received the notice.

## FACTS AND PROCEDURAL HISTORY

Defendant's jury trial began on January 25, 2016. The State's first witness was Ms. Linda Nicholas, the victim's sister. Ms. Nicholas testified that on May 21, 1988, her sister, the victim Brenda Dupont, was living in an apartment that was only about ten feet directly behind her own apartment. Ms. Nicholas testified that on the afternoon before her sister was murdered, Defendant was at Ms. Nicholas' home visiting her daughter, Michelle. Ms. Nicholas stated that she had an altercation with Defendant and kicked him out of her house because he had brought a knife to her house. Defendant claimed that he was just "playing" with the knife, but Ms. Nicholas said, "We don't play." She testified that she last saw Brenda that night before Brenda went back to her apartment, around 6:30 or 7:00 p.m.

Ms. Nicholas testified that the following morning, she made breakfast and sent her six-year-old son to wake Ms. Dupont, but that they were unable to rouse her. Ms. Nicholas got worried when there was no response by 11:30 a.m. She eventually called the police, who discovered Ms. Dupont's body and would not allow Ms. Nicholas to enter the apartment.

Ms. Nicholas stated that she knew Defendant because he went to school with her children and liked her daughter, Michelle, but that she did not always allow him to visit because he liked to fight with her sons. She testified that at the time of her sister's murder, she was living with her children and a man named Dicker Ray Chavis.

Ms. Nicholas testified that she had not seen anyone go into or out of her sister's apartment the evening she died, noting that Brenda was married but was separated from her husband. Ms. Nicholas testified that although she slept around ten or twelve feet from the side door to her sister's apartment, she did not hear anything because the weather was stormy that night.

The State's next witness was Rene Speyer, an employee of the St. Landry Parish District Attorney's Office who was previously employed by the St. Landry Parish Sheriff's Office for thirty-eight years, including at the time of Ms. Dupont's death. Mr. Speyer videoed the crime scene in 1988, and that video was presented to the jury without sound as State's Exhibit 2. Mr. Speyer testified that the video and a photograph showed the area between Ms. Dupont's apartment and the fence behind it. There was damage to the vegetation and footprints on the side of the apartment, indicating that the point of exit was the bedroom window near where the footprints were discovered, as the bedroom door had been locked from the inside.

Defendant's cross-examination of Mr. Speyer was mainly asking him to identify specific items that can be seen on the video. However, Mr. Speyer

acknowledged that he never determined an entry point into the apartment, that he did not recall seeing any windows which appeared to be pried open or broken, and that most of the windows had undisturbed items on the windowsills. Mr. Speyer also noted that the only area of the house, other than the bed, that appeared to have been disturbed was a dresser drawer in the bedroom, which was pulled out and overturned onto the floor.

Sergeant Loretta Etienne, a twenty-two year veteran of the Opelousas Police Department who is the current evidence custodian, next took the stand. She testified that evidence is secured in a combination lock vault, but that the evidence custodian is not responsible for keeping investigative reports. Sergeant Etienne noted that she has only been the department's evidence custodian for about six months, and that she had not even joined the force yet at the time of Brenda Dupont's death.

The State next called Dr. Dawn Young, a professor at Bossier Parish Community College and former Lab Director at the North Louisiana Forensic Pathology Lab. Dr. Young was also the Deputy Coroner of Bossier Parish for twelve years and the Coroner for four years, from 1996-2000. She was also Dr. George McCormick's[1] assistant for twenty-two years, and was accepted as an expert in Medical/Legal Death Investigation. Dr. Young was Dr. McCormick's assistant during the autopsy of the victim Brenda Dupont on May 21, 1988. Dr. Young testified that the victim had defensive wounds on both hands. Additionally, the victim had incisions on her chest, neck, and upper arms, as well as a potential bite mark. She also testified that a vaginal swab was collected which contained semen, but stated they did not do any testing on the semen to try and determine potential donors.

---

[1]Dr. George McCormick was the coroner who performed the autopsy on Ms. Dupont. He was deceased at the time of trial.

3

Dr. Young noted smear samples taken from the vaginal, nasal, oral, and rectal cavities, were tested, and that sperm was found in the vaginal smear, as well as occasional degenerative sperm heads being present in the oral and rectal smears. Dr. Young also testified she could not conclusively determine whether or not the victim was raped or had consensual sex, specifically stating that "[t]ypically you can't [determine rape] from an external examination" of a woman of child-bearing years. She further noted that after Dr. McCormick performed the autopsy, the evidence recovered was submitted to Patrick Lane with the State Police Crime Lab.

Mr. Lane, a thirty-eight year employee and crime lab analyst of the Louisiana State Police Crime Lab (LSPCL), was the next witness to testify. Mr. Lane testified that he recalled receiving evidence from Dr. McCormick and subsequently transported those items to the LSPCL for testing. He also enumerated all of the evidence that was submitted to the LSPCL in this case. Mr. Lane also went through multiple pages of reports describing fingerprint analysis done by the LSPCL around the time of Ms. Dupont's death, noting that over twenty people's fingerprints were tested against the prints in the apartment. Mr. Lane then confirmed that State's Exhibit 7A appeared to be a fingerprint analysis form which indicated Defendant's fingerprints were tested on May 25, 1988. Defendant's fingerprints did not match any of the prints taken from the apartment.

The next witness to take the stand was Mr. Jude Victorian, who spent roughly ten years as an employee of the Opelousas Police Department. Mr. Victorian testified that he brought photographs of the bite marks on the victim to a Dr. Bill Lagattuta in Washington, D.C., along with a cast of Clint Thompson's[2] teeth. Dr. Lagattuta, an expert in odontology, did not believe Mr. Thompson's

---

[2]Clint Thompson was a suspect during the initial investigation. He was deceased by the time Defendant was brought to trial.

4

teeth matched the marks on the victim. Mr. Victorian further testified that he could not recall specifics of what he did during the course of the investigation or who he interviewed, but that he would have written reports that would have been included in the case file.

The State's next witness was Mr. Ronnie Trahan, a St. Landry Parish Sheriff's Office employee who was previously with the Opelousas Police Department for twenty-eight years, including May 1988. Mr. Trahan testified that a few years after Ms. Dupont's death, he spoke with Dr. Lagattuta at his office in Baton Rouge while retrieving evidence that was still in Dr. Lagattuta's possession. Mr. Trahan testified that Dr. Lagattuta informed him that he was never able to make a match between the photos submitted and Clint Thompson's teeth. Mr. Trahan stated that he did not actually retrieve any evidence from Dr. Lagattuta, as the evidence had already been returned to Mr. Victorian, and that he did not recall writing a report on his trip for the case file. Mr. Trahan remembers speaking with Defendant and Mr. Dicker Chavis during the investigation, but is not clear who else, if anyone, he spoke to in connection with this case.

The State then called Mr. George Schiro, the lab director at Scales Biological Laboratory in Mississippi, who previously worked for the Acadiana Crime Lab, the Louisiana State Police Crime Lab, and the Jefferson Parish Sheriff's Office Crime Lab. It was stipulated that Mr. Schiro is an expert in forensic science with specialties in serology and DNA analysis. Mr. Schiro testified that "[i]n 1988 there were no public crime laboratories doing DNA in the state and I'm not sure if there was a private lab called Gentest but I don't recall if they had started in 1988." Mr. Schiro noted that in 1988, DNA testing was not commonly used by Louisiana law enforcement and that they were essentially limited to blood-typing and cross-referencing a small number of genetic markers. Mr. Schiro testified that in 2012 during the cold case investigation, they discovered

5

a DNA profile in the vaginal swab taken from the victim, which was subsequently found to be a match to the DNA profile provided by Defendant. He testified that "the probability of selecting an unrelated individual was approximately one in thirteen billion." He further testified that by testing the Y-chromosome of the seminal fluid found, the chance of incorrectly identifying Defendant was about one in three hundred billion, barring identical twins.

Mr. Schiro testified, much like Dr. Young, that there was no way to conclusively tell whether the sexual intercourse between Defendant and Brenda Dupont was consensual or rape. Mr. Schiro noted that, based on the presence of acid phosphates and a protein called P30, they determined that there was seminal fluid on the rectal swabs, however, there were no spermatozoa present, whereas they found sperm heads on the vaginal swab. Mr. Schiro noted that studies have found sperm can survive for as long as nineteen days in the female cervix, and specifically noted that "there's really no, no way to time when the sperm got there; how long it's been there or anything like that." Mr. Schiro also acknowledged that there were other items which had been tested for DNA evidence:

> We had already run the other test on some of those other items that had generated profiles and those were put into CODIS. So, we already had unknown profiles that were in CODIS. Just because they didn't match anyone we, there [sic] was no point in going further and doing the Y testing unless we had someone to compare them to.

Mr. Doris Hoffpauir, an employee of the St. Tammany Parish Coroner's Office and former employee of the Louisiana State Police Crime Lab, was stipulated to be a DNA expert. She testified that the only sample she was asked to match in this case was the profile that matched Defendant.

Next, Dr. Christopher Tape took the witness stand. The parties stipulated that Dr. Tape is a medical doctor with a specialty in forensic science. Dr. Tape agreed with the original autopsy report of Dr. McCormick and confirmed that the cause of death was the thirty-one stab wounds/incisions found on the victim's

6

body. He also agreed that the numerous wounds to the victim's hands were consistent with defensive wounds. With regard to the bite mark found on the victim, Dr. Tape acknowledged that trying to make a match based on bite marks is rarely used, as it is very difficult to make said match or to exclude someone as having made the mark, noting that "[a] lot of our teeth are the same." There was also a discussion of some of the medication reported in the autopsy to be in the victim's system at the time of her death, namely phenothiazines, a type of tranquilizer used as antipsychotic medication used to treat schizophrenia and other mental disorders. Dr. Tape testified that none of the medicines in the victim's system worried him, as they were all within therapeutic ranges.

The next witness to take the stand was Mr. Greg Leblanc, a Lieutenant and supervisor of investigative services with the Opelousas Police Department. Lieutenant Leblanc testified that he obtained the search warrant for Defendant's DNA to confirm the profile match from CODIS.

The State then called Sergeant Crystal Leblanc of the Opelousas Police Department's investigations unit. Sergeant Leblanc testified that she personally obtained the DNA sample from Defendant and sealed it for evidence before giving the bag containing the sample to Sergeant Jody White, the evidence custodian, who in turn transported the evidence to the Acadiana Crime Lab.

The State's next witness was Ms. Sybil Guidry, who previously spent thirty years working in the "Latent Section" of the Louisiana State Police. Ms. Guidry was stipulated to be an expert in "Forensic Science with a specialty in fingerprint identification." Ms. Guidry testified that she did all of the fingerprint comparisons in this case when the murder originally occurred in 1988 and then had them peer-reviewed by a coworker. She also testified that the only identification they were able to make, after testing twenty-six sets of known prints against the prints recovered from the crime scene, was Monica Bergeron, the victim's daughter. She

confirmed that none of the prints she tested from the crime scene matched Defendant's prints.

The State then recalled Ronnie Trahan in order to introduce an audio recording of a statement Defendant gave on May 23, 1988, to Mr. Trahan and Detective Willie Smith, who had since died. In this initial interview, Defendant denied even knowing the victim, even though he had been present at Ms. Nicholas' home the afternoon before the victim was murdered. The recording was played for the jury. Mr. Trahan noted that there were scratch marks on Defendant's neck at the time of the interview, but he did not recall ever trying to confirm that those scratches came from the victim's niece, Stephanie Keys, as Defendant claimed they did. He also did not recall whether he took photographs of the scratches. Ms. Keys denied that she had ever scratched the defendant.

The next witness to take the stand was Dwain Grimmett, a private investigator who retired in 2013 after twenty-two years as a member of the Opelousas Police Department. Mr. Grimmett testified that he was assigned this case as a cold case in 2012, at which time he retrieved all of the information the department had on the case. Mr. Grimmett testified that he could never locate the original paper file in this case, as parts of the original case file had been lost or discarded, but he located videos, recordings, and physical evidence. Mr. Grimmett testified that he has never been able to find the entirety of the original case file. The State then introduced a video of Mr. Grimmett's March 23, 2012, interview with Defendant wherein Defendant again denied ever having sex with the victim. The State also introduced a video of Mr. Grimmett's March 29, 2012, interview with Defendant that was also played for the jury. Defendant once again denied ever having sex with the victim. Mr. Grimmett testified that Defendant stated that he "had no idea who the victim was. He didn't know her." Mr. Grimmett was shown photos of the victim and the crime scene and testified that based on his

8

twenty-two plus years' experience in law enforcement, it made him immediately think the victim was raped. The scene did not look anything like a consensual act had taken place.

Mr. Grimmett also testified that he interviewed a Ms. Irma Robinson in April 2012, and that she had previously given a statement in 1988 that she was across the street from the victim's residence at Papillion's Grocery at three o'clock in the morning on May 21, 1988, heard a woman screaming, and called 9-1-1, which put her on hold. He could not confirm whether or not Ms. Robinson called 9-1-1, as there were no phone records going back far enough to confirm. He also specifically noted that he never requested that Mr. Schiro test any of the other remaining evidence from the crime scene, including the victim's clothing, to see if there was DNA that matched Defendant on any of those items.

The State's final witness was Jean Harrison (inadvertently spelled "Gene" in the transcript), an investigator for the St. Landry Parish District Attorney's Office who previously spent twenty-five years with the Opelousas Police Department. Ms. Harrison testified that she was the first officer on the scene. She testified that she thought the exit point was the window on the back of the house as all the doors on the home were locked from the inside. Ms. Harrison stated that after the landlord gave her permission to kick in the door, Mr. Dicker Chavis was the one who actually kicked in the door. Ms. Harrison testified that she could see there was blood on the bed and on the wall, and the victim was dead on the floor with a pillow on her face.

The first witness called by Defendant was Mr. Jim Churchman, who retired from the Louisiana State Police Crime Lab after thirty-eight years. Mr. Churchman testified that as the physical evidence custodian, he had received evidence that led to his deciding that another suspect was responsible for the murder and that the evidence would resolve the case. After this conclusion, Mr.

9

Churchman decided to return any untested evidence to the Opelousas Police Department, informing the Chief of Police of his decision via letter.[3] Mr. Churchman, however, testified that knowing what he knows now about the additional evidence, scientific reliability, and testimony presented to the jury, he would not have made the same decision; however, that decision was "the best decision based on the information that was before [him] at that time."

The next witness to take the stand was Howard Zerangue, Jr., who was the Chief of Police in Opelousas during the initial investigation of this case. Mr. Zerangue testified to his limited involvement in the case, and that the lead detective would have been responsible for the case file.

After the aforementioned extensive testimony presented to the jury and closing arguments, the jury returned a 10-2 verdict of guilty of first degree murder during the commission of an aggravated rape.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there is one error patent.

The court minutes of sentencing indicate the defendant was provided written notice of his right to seek post-conviction relief. However, this notice does not appear in the record and the trial court clerk's office verified that no written notice was filed in the record. The sentencing transcript contains no mention of the written notice. In a similar situation, this court required the notice to be given. *See State v. Richard*, 94-1263 (La.App. 3 Cir. 5/17/95), 657 So.2d 258. Thus, we instruct the trial court to inform Defendant of the provisions of La.Code Crim.P.

_____

[3]This letter, not in evidence, stated that Dr. Lagattuta had conclusively identified the bite marks on the victim as having been made by another suspect, Mr. Clint Thompson, and was the subject of extensive pre-trial litigation, with the supreme court ultimately ruling that it was inadmissible hearsay. *See State v. Rubin*, 15-1753 (La. 11/6/15), 183 So.3d 490.

art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof in the record that Defendant received the notice. *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

## ASSIGNMENTS OF ERROR

On appeal, Defendant asserts the following as error:

1. The circumstantial evidence presented failed to support a conviction for First Degree Murder and/or Aggravated Rape.

2. The trial court erred in admitting an exculpatory and self-serving statement of the defendant offered by the State which was inadmissible hearsay.

## DISCUSSION

### *Assignment of Error One*

In his first assignment of error, Defendant alleges that the evidence was insufficient to support his conviction. The insufficiency of evidence analysis is well-established. The supreme court recently stated in *State v. Reed*, 14-1980, p. 20-21 (La. 9/7/16), ___ So.3d ___:

> In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *State v. Captville*, 448 So.2d 676, 678 (La. 1984). Applying the *Jackson* standard, the appellate court must determine the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Captville*, 448 So.2d at 678.

> To obtain a conviction for first-degree murder in this case, the State was required to prove beyond a reasonable doubt that defendant killed a human being when he had the specific intent to kill or to inflict great bodily harm upon more than one person. La. Rev. Stat. 14:30(A)(3). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. Rev. Stat. 14:10(1); *State v. Butler*, 322 So.2d 189, 192–93 (La. 1975). Specific intent to kill may also be inferred from a defendant's act of pointing a gun and firing at a person. *State v. Williams*, 383 So.2d 369, 373 (La. 1980); *State v. Procell*, 365 So.2d 484, 492 (La. 1978).

A panel of our court also most recently stated in *State v. Smith*, 16-188, p. 6 (La.App. 3 Cir. 10/12/16), ___ So.3d ___:

> In *State v. Dotson*, 04–1414, p. 1 (La.App. 3 Cir. 3/2/05), 896 So.2d 310, 312, (quoting *State v. Chesson*, 03–606, p. 5 (La.App. 3 Cir. 10/1/03), 856 So.2d 166, 174, *writ denied*, 03–2913 (La. 2/13/04), 867 So.2d 686), this court has explained the insufficiency analysis as follows:
>
> > In considering questions of sufficiency of the evidence, a reviewing court must consider the evidence presented in the light most favorable to the prosecution and consider whether a rational trier of fact could have concluded that the essential elements of the offense were proven beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court defers to rational credibility and evidentiary determinations of the trier of fact. *State v. Marcantel*, 00–1629 (La. 4/3/02), 815 So.2d 50.

Further, our court has provided:

> In *State v. Jackson*, 14–9, p. 4 (La.App. 3 Cir. 6/18/14), 146 So.3d 631, 634–35, *writ denied*, 14–1544 (La. 2/27/15), 159 So.3d 1066, this court noted:
>
> > It is well settled that the fact finder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07–504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. An appellate court should not second guess the credibility conclusions of the trier of fact, but rather, should defer to the rational credibility and evidentiary determinations of the jury. *Id.* The appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental protection of due process of law." *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988). As stated herein, upon viewing evidence in the light most favorable to the prosecution, the question for the appellate court is whether, on the evidence presented at trial, "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Strother*, 09–2357, p. 10 (La. 10/22/10), 49 So.3d 372, 378 (quoting *Jackson* [*v. Virginia*], 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 [1979]).
> >
> > In those cases relying on circumstantial evidence, the fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there

is another hypothesis which raises a reasonable doubt."
*State v. Captville*, 448 So.2d 676, 680 (La.1984).

*Id.* at 8.

When reviewing a jury's conviction based on circumstantial evidence, the supreme court recently reiterated that "in effectuating the *Jackson* standard, [the court] has found that '[w]hen a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by [defendant], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.'" *State v. Ellis*, 14-1511, p. 2 (La. 10/14/15), 179 So.3d 586, 588 (citing *State v. Captville*, 448 So.2d 676, 680 (1984)). Further, "[t]he test of the sufficiency of circumstantial evidence is not whether it produces the same conviction as the positive testimony of an eyewitness, but whether it produces moral conviction such as would exclude every reasonable doubt." *State v. Shapiro*, 431 So.2d 372, 385 (La.1982) (citing *State v. Jenkins*, 134 La. 185, 63 So. 869 (1913)).

During the two-day jury trial, the jury heard extensive testimony recreating the scene of this over two-decade old murder. At the very least, the jury heard about Defendant's violent tendencies from Ms. Nicholas, the victim's sister. Further, Ms. Nicholas testified that the victim and Defendant knew each other, as they had both been at Ms. Nicholas' house on the afternoon prior to the discovery of the victim's body. Ms. Nicholas testified that she threw Defendant out of her house because he was brandishing a knife, and that previously, Defendant had fought with her sons.

Dr. Young testified that Defendant's sperm was found on the victim's vaginal smear. Mr. Schiro testified that in 2012, a DNA profile in the vaginal swab was found to be a positive match to the DNA profile provided by Defendant. Mr. Schiro also testified that "the probability of selecting an unrelated individual was approximately one in thirteen billion." In addition, he stated by testing the Y-

chromosome of the seminal fluid found, the chance of incorrectly identifying Defendant was about one in three hundred billion, barring identical twins. Yet Defendant told the investigators on at least three occasions that he had not had intercourse with the victim and had stated that he did not even know the victim.

Dr. Tape testified that the victim's cause of death was thirty-one stab wounds and/or incisions, confirming Dr. McCormick's initial autopsy report. Further, Dr. Tape stated that there were defensive wounds on the victim's hands. The jury also watched the 2012 video interview that Mr. Grimmett had with Defendant, wherein Defendant denied ever having intercourse with the victim, again claiming he did not know her. The jury was able to see video of the crime scene with blood on the mattress and walls and the overturned dresser drawer. In addition, Defendant had scratch marks on his neck noted by Mr. Trahan which Defendant said came from the victim's niece, Stephanie Keys. However, Ms. Keys testified that she had no recollection of ever scratching the defendant.

Most importantly, Defendant's DNA was found in the seminal fluid from the victim's vaginal swab. Defendant previously denied in several prior statements played for the jury that he knew the victim and denied he had ever had sex with her.

According to Mr. Grimmett, the video and crime scene photos presented to the jury depict an obvious rape and murder scene where the victim was killed during a violent rape, having been stabbed or cut thirty-one times. The victim was found naked with most wounds concentrated around her face, head and chest and multiple defensive wounds evidencing her attempt to fight back during her rape and murder. Mr. Grimmett's testimony was based on his twenty-two plus years experience in law enforcement. The jury had an opportunity to see him and evaluate his credibility. The jury also was able to review first hand the videos and pictures of the crime scene.

14

Proof of murder during the commission of an aggravated rape satisfies the essential elements of the crime of first degree murder. Louisiana Revised Statutes 14:30 (emphasis added) provides, in pertinent part:

> A. First degree murder is the killing of a human being:
>
> (1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, **aggravated or first degree rape**, forcible or second degree rape, aggravated burglary, armed robbery, assault by drive-by shooting, first degree robbery, second degree robbery, simple robbery, terrorism, cruelty to juveniles, or second degree cruelty to juveniles.

The jury considered the evidence in totality, made credibility determinations and concluded that the essential elements of the crime had been proven beyond a reasonable doubt. As provided in the jurisprudence, it is not our role to second-guess the jury's credibility decisions. Thus, viewing the evidence in a light most favorable to the prosecution, we find that Defendant's assignment of error lacks merit.

### *Assignment of Error Two*

In his second assignment of error, Defendant contends that the trial court "erred in admitting an exculpatory and self-serving statement of Defendant offered by the State which was inadmissible hearsay." Defendant argues that the State should have been prohibited from introducing multiple heresay statements given to law enforcement by Defendant in which he claimed he had never had sex with the victim. Defendant's argument is based primarily on his claim that said statements were "exculpatory" statements that should have been excluded under La.Code Evid. art. 804(B)(3), as the statements were not inculpatory or made against his own interest. In *State v. Alexander*, 03-167, pp. 8-9 (La.App. 3 Cir. 9/10/03), 854 So.2d 456, 462, *writ denied*, 03-2822 (La. 3/12/04), 869 So.2d 815, this court quoted La.Code Evid. art. 804(B)(3) in stating that an inculpatory statement is:

15

[A] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true.

Defendant argues that his statements that he never had sex with the victim, though proven to be false, were in no way contrary to Defendant's interest at the time they were made. The State argued to both the trial court and this court that because Defendant said he did not have sex with the victim, consensual or otherwise, the fact that he was demonstrably lying means the statement was actually inculpatory. In the alternative, the State contends that because defense counsel did not object to Mr. Grimmett's testimony that Defendant had denied having sex with the victim on his interview with Defendant, it was harmless error because the content of the statements have been admitted anyway.

The arguments presented to this court by both Defendant and the State assume the statements are hearsay, and therefore the admissibility of said statements hinges upon whether or not they fall into one of the exceptions listed in La.Code Evid. art. 804. However, under La.Code Evid. art. 801(D)(2)(a), a party's own statement, offered against him, is by definition NOT hearsay. Accordingly, the argument over whether or not the statements fall under an exception to the prohibition against hearsay is irrelevant.

Additionally, the second circuit cited the supreme court's decision in *State v. Roshto*, 222 La. 185, 62 So.2d 268 (1952), when it noted "that evidence of exculpatory, *but false*, statements is competent and admissible to establish some inference of guilt. *The prosecution may prove such declarations of the accused, and then prove their falsity.*" *State v. McFadden*, 476 So.2d 413, 419 (La.App. 2 Cir. 1985), *writ denied*, 480 So.2d 739 (La.1986). The State introduced the statements in order to show that Defendant had lied about the fact that he did not know the victim and never had had sex with her, which was proven conclusively

16

by the DNA testimony presented at trial. Accordingly, the trial court did not err in admitting Defendant's prior "exculpatory" statements.

## DISPOSITION

We find that Defendant's assignments of error lack merit. Thus, we affirm Defendant's conviction and sentence. The trial court is instructed to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof in the record that Defendant received the notice.

**AFFIRMED WITH INSTRUCTIONS.**

STATE OF LOUISIANA

VERSUS

JOENELL RUBIN


THIBODEAUX, Chief Judge, dissenting.


I disagree with the majority's affirmance of Defendant's jury conviction on very scant circumstantial evidence. I simply do not think the circumstantial evidence excluded every other reasonable hypothesis.

The State provided no evidence which could actually place Defendant at the crime scene beyond a reasonable doubt. The only witness to state the victim was raped was the detective whose first involvement in the case was more than twenty years after the victim's death. Both Doctors Young and Tape refused to say that the victim was raped. The State's DNA expert, Mr. Schiro, also refused to say that the victim was raped. The State's entire argument for rape and murder was that Defendant lied about having sex with the victim. Because the State had DNA proof that Defendant did have sex, there was no other explanation but that Defendant raped and murdered the victim in her home, the State contends.

However, there was much countervailing evidence. There were more than twenty fingerprints. None belonged to Defendant. The only evidence placing Defendant at the crime scene was that his DNA was inside the victim. However, that does not show that he must have been in her apartment at the time of her death. The expert testimony indicated that sperm could exist for nineteen days. There was no testimony that anyone had ever seen Defendant enter or exit the victim's apartment. In summary, the State provided no evidence, forensic or

otherwise, that could place Defendant inside the victim's home at any point, let alone at the time of her death.

For the foregoing reasons, I respectfully dissent.